(No. 22284.—

NELLIE D. MICHAELS, Appellant, vs. EDWARD J. BARRETT, Auditor of Public Accounts, et al. Appellees.

*Opinion filed January 24, 1934—Rehearing denied Feb. 22, 1934.*

A. M. Fitzgerald, B. L. Catron, and W. P. Roberts, for appellant.

Otto Kerner, Attorney General, (Montgomery S. Winning, of counsel,) for appellees.

Mr. Justice DeYoung delivered the opinion of the court:

Nellie D. Michaels, a qualified tax-payer, filed a bill, and later an amended bill, in the circuit court of Sangamon county against the Auditor of Public Accounts and the State Treasurer. By her amended bill, the complainant

sought to restrain the disbursement of money from the motor fuel tax fund to discharge the interest on and the principal of bonds issued by the State to provide for the relief of destitute persons. The amended bill was subsequently amended and the defendants interposed a demurrer thereto. The court sustained the demurrer and dismissed the bill for the want of equity. The complainant prosecutes this appeal.

The wide extent of unemployment and consequent destitution early in the year 1932, led the General Assembly to enact various measures the purpose of which was to afford immediate relief to residents of the State who were in want of the necessaries of life. By an act entitled "An act to create the Illinois Emergency Relief Commission, to define its powers and duties, and to make an appropriation therefor," approved February 6, 1932, (Laws of 1931-32, p. 191), the Illinois Emergency Relief Commission was created and the duty was imposed upon the commission, until March 1, 1933, to provide relief to residents of the State who by reason of unemployment or otherwise, were destitute and in necessitous circumstances. To carry out the provisions of the act, the sum of $20,000,000 was appropriated to the commission from the emergency relief fund in the State treasury. By an amendment, approved June 30, 1933, (Laws of 1933, p. 207), the period during which the commission should perform its duties was extended to August 1, 1935.

By another act entitled "An act to provide by a State tax the necessary revenue for relief of residents of the State of Illinois, who by reason of unemployment or otherwise are destitute and in necessitous circumstances," approved February 6, 1932, (Laws of 1931-32, p. 202), a general property tax of $25,000,000 was levied for the year 1932. The tax was directed to be paid into the State treasury and set apart in a fund designated as the emergency relief fund. The Governor, the Auditor of Public Accounts

and the State Treasurer were charged with the duty of computing the rate required to produce the sum levied. It was further provided that if, at the time the tax rate should be computed, no notes drawn in anticipation of the tax so levied were outstanding, then the tax should be neither certified nor collected.

By a third act entitled "An act to amend sections 1, 3, 4, 4a and 5 of 'An act in relation to the anticipation of taxes levied by the State of Illinois,' approved April 13, 1931, as amended," approved February 6, 1932, (Laws of 1931-32, p. 217), the act authorizing the issuance of anticipation notes against State tax levies was amended so that such notes could be issued immediately against the preceding tax levy of $25,000,000. The amendatory act also contained an appropriation of $20,000,000 from the emergency relief fund to pay the interest on and the principal of the anticipation notes issued against that levy.

A fourth act entitled "An act to provide for an issue of bonds of the State of Illinois for the relief of indigent persons and for the redemption of notes issued in anticipation of taxes levied for that purpose," approved February 6, 1932, (Laws of 1931-32, p. 193), authorized the issuance and sale of bonds of the State to the amount of $20,000,000 to obtain funds for the relief of residents who were destitute and in necessitous circumstances and for the redemption of notes drawn in anticipation of the tax levied by the second of the foregoing acts. The Illinois Emergency Relief Commission was given general control and supervision of the issuance, sale and retirement of these bonds and they were to be issued from time to time as might be necessary to provide sufficient money for the relief of the destitute and the redemption of such anticipation notes. The proceeds of the bonds were required to be paid into the emergency relief fund in the State treasury. The levy of a direct annual tax to pay the interest on and the principal of these bonds was authorized. It was pro-

vided, however, that out of each allotment of money to the counties under the provisions of the Motor Fuel Tax law, as amended, a sufficient amount should be set aside to pay the maturing interest on, and principal of, the bonds issued pursuant to the act; that the amount reserved from the allotment to any county should be in the same proportion that the relief furnished to persons in that county under the act by which the Illinois Emergency Relief Commission was created bore to the total relief furnished to persons in the State, and that the total so set aside should be appropriated and applied annually to the discharge of such maturing interest and principal. The act contained a proviso that the direct tax authorized by it should not be levied for any year in which sufficient money had been appropriated from other sources of revenue to pay the interest and principal maturing in that year. The direct tax, as collected, was required to be paid into the emergency relief bond interest and retirement fund. Provision was made for the submission of the act to the people of the State on a separate ballot at the general election to be held on November 8, 1932.

Section 9 of "An act entitled 'An act in relation to a tax upon the privilege of operating motor vehicles upon the public highways, based upon the consumption of motor fuel therein, and making certain appropriations in connection therewith,' approved March 25, 1929, as amended," known as the Motor Fuel Tax law, was made to conform to the provision of the preceding act with respect to the setting aside, out of each allotment of money to the several counties pursuant to the Motor Fuel Tax law, of a sufficient sum to pay the maturing interest and principal of the bonds issued to obtain funds for the relief of the destitute. The amendatory act by which the change became effective was approved February 6, 1932. Laws of 1931-32, p. 203.

The issuance of the bonds aggregating $20,000,000 for relief purposes was approved by the people at the election

on November 8, 1932. The bonds were sold and the proceeds derived from their sale were disbursed in retiring the notes issued in anticipation of the tax levied by the second of the acts enumerated. The legislature, at the succeeding regular session, enacted House Bill No. 913, approved July 5, 1933, (Laws of 1933, p. 163), by which $1,800,000 was appropriated to pay the interest on, and $1,500,000 to discharge the maturing principal of, the bonds so authorized and issued. These sums, the act provided, were made "payable from amounts set aside from allotments to counties, (emergency relief bond interest and retirement fund), under the provisions of the Motor Fuel Tax law in the same proportion that the relief furnished to persons in that county under the provisions" of the act creating the Illinois Emergency Relief Commission "bears to the total relief furnished to persons in the State."

The appellant maintains that, notwithstanding the acts set forth, the Auditor of Public Accounts may not draw warrants upon, and the State Treasurer may not pay money out of, the motor fuel tax fund, to discharge the interest on, and the principal of, the bonds issued to obtain funds for the relief of the destitute. In the consideration of the contentions which the appellant urges to sustain her conclusion, reference will be made to the foregoing enactments as the first, second, third, fourth, fifth and sixth acts respectively.

It is contended that the titles to the fourth and fifth acts express more than one subject and that the acts themselves embrace subjects not expressed in the titles, in violation of section 13 of article 4 of the constitution. The section invoked provides that no act shall embrace more than one subject, and that the subject shall be expressed in the title. The subject of an act has been defined to mean the matter or thing which forms its basis or groundwork. (*People* v. *Solomon*, 265 Ill. 28; *Perkins* v. *Board of County Comrs.* 271 id. 449). The general purpose of the

constitutional provision is accomplished when a law has but one general subject which is indicated by its title. The title is not required to be an index to the body of the act. If the title fairly indicates the general subject and reasonably covers all the provisions of the act so that it is not calculated to mislead the General Assembly or the people, it is a sufficient compliance with the constitutional requirement. Unless the act contains matters which are not germane to the title, or the title expresses subjects without any proper relation to each other, the constitutional provision is not violated. The General Assembly must determine the comprehensiveness of the subject of an act and the particularity of the title defining the subject. An act having a single general subject expressed in the title may contain many provisions, however diverse, if they are not inconsistent with or foreign to the subject; and provisions for the method and means of effectuating the act may be incorporated in it. (*Department of Public Works* v. *Spanogle,* 327 Ill. 122; *People* v. *Stacker,* 322 id. 232; *Public Service Co.* v. *Recktenwald,* 290 id. 314; *Sutter* v. *People's Gas Light and Coke Co.* 284 id. 634; *Perkins* v. *Board of County Comrs.* 271 id. 449; *Manaster* v. *Kioebge,* 257 id. 431; *People* v. *McBride,* 234 id. 146; *People* v. *Nelson,* 133 id. 565). The tendency is to construe this constitutional provision liberally, and not strictly, for the latter course would embarrass legislation and largely defeat the beneficial purposes for which the provision was adopted. Cooley's Const. Lim. (7th ed.) p. 209.

The title to the fourth act is "An act to provide for an issue of bonds of the State of Illinois for the relief of indigent persons and for the redemption of notes issued in anticipation of taxes levied for that purpose." The issuance of bonds of the State to obtain funds for the relief of indigent persons was the purpose of the act. Provision was made for the payment of the bonds by recourse pri-

marily to a source of revenue other than a direct tax upon property and secondarily to such a tax. To accomplish the purpose of the act, it was imperative that funds be made immediately available and hence notes were issued in anticipation of the collection of the revenue pledged and the tax levied. The redemption of such notes was germane to the object and purpose of the act and was expressed in the title. The inclusion in the title of an indication of the manner in which the proceeds of the sale of the bonds shall be applied does not create a plurality of subjects, nor is the act vulnerable to the objection that it embraces subjects not expressed in the title.

The fifth act has as its title "An act to amend section 9 of 'An act in relation to a tax upon the privilege of operating motor vehicles upon the public highways, based upon the consumption of motor fuel therein, and making certain appropriations in connection therewith,' approved March 25, 1929, as amended." The title of the original act is repeated verbatim in the amendatory act. Section 9, as originally enacted, specified the use to be made of the portion of the motor fuel tax allotted to the several counties. The amendatory act prescribes a different and preferential use of a part or the whole of the share of the tax so allotted. A provision for the disposition of a tax is germane to the subject matter of an act imposing the tax. (*Winter* v. *Barrett,* 352 Ill. 441; *People* v. *Sargent,* 254 id. 514). Moreover, the title to the amendatory act is as broad as the title to the original act. An act to amend another act, the former setting forth the latter's title, is as comprehensive as the act amended, and any provision which might have been inserted in the original act may be incorporated in the amendatory act without violating the constitutional provision that the subject of an act shall be expressed in the title. (*Gage* v. *City of Chicago,* 203 Ill. 26). So far therefore as section 13 of article 4 of the constitution is concerned, the specification of an additional and primary use

of the portion of the particular tax apportioned to counties does not affect the validity of the amendatory act.

The contention is made that the fifth act in effect amends section 8 of the Motor Fuel Tax law without expressing the subject of the amendment in the title and without inserting at length in the new act the section amended, as required by section 13 of article 4 of the constitution. Section 8 of the Motor Fuel Tax law apportions the proceeds of the tax, but does not specify the purposes to which the allotments of such proceeds to counties shall be applied. This specification is made by section 9 and when the legislature determined upon an additional use for the funds so allotted, it amended that section. The fifth act provides that out of the allotments to counties, a sufficient sum shall be set aside to pay the interest on, and to discharge the maturing principal of, the emergency relief bonds, and that the amount reserved from the allotment to any county shall be in the same proportion that the relief furnished to persons in that county, under the provisions of the first, the Illinois Emergency Relief Commission, act bears to the total relief furnished to persons in the State. A similar provision was incorporated in the fourth, the Emergency Relief Bond Issue, act. Obviously, the purpose of amending section 9 of the Motor Fuel Tax law was to avoid the objection that this provision in the Emergency Relief Bond Issue act would amend the Motor Fuel Tax law by reference contrary to the limitations of the constitution.

The appellant further contends that the fourth and fifth acts attempt to set aside and to apply for the relief of destitute persons indefinite sums of money, in violation of section 16 of article 5 of the constitution. The pertinent provision of that section is that bills making appropriations of money out of the treasury shall specify the objects and purposes and appropriate to them respectively their several amounts in distinct items and sections. The fourth act authorized the issuance and sale of bonds to provide funds

for the relief of residents of the State who were destitute, and provision was made for the redemption and retirement of notes drawn against and in anticipation of the tax levied to produce the revenue necessary for this charitable purpose. The portion of the tax upon the privilege of operating motor vehicles upon the public highways apportioned to the several counties in accordance with the provisions of the Motor Fuel Tax law, however, was made primarily available to pay the interest on, and to discharge the principal of, the bonds so issued, and to the extent that this source of revenue was sufficient to retire the bonds, the direct tax was abated. By the fifth act, the ninth section of the Motor Fuel Tax law, which specified the purposes to which the allotments of the tax to the several counties should be applied, was brought into conformity with the relevant provisions of the fourth act, which authorized the issuance of bonds for relief purposes. The two acts under review provide that these bonds, principal and interest, shall be paid out of the allotments of the proceeds of the particular privilege tax to the several counties before recourse may be taken to the direct tax levied to pay them. No appropriation was made by either of these acts. The legislature, by the act known as House Bill No. 913, approved July 5, 1933, (Laws of 1933, p. 163), appropriated $1,800,000 to pay the interest on, and $1,500,000 to discharge the maturing principal of, the bonds authorized by the fourth act. The act approved July 5, 1933, specifies the objects and purposes for which the appropriations are made and sets apart to them respectively the several amounts in distinct items and sections as required by section 16 of article 5 of the constitution.

It is contended that the appropriation for the payment of the interest on, and the discharge of the maturing principal of, the bonds issued by authority of the fourth act is made out of the relief bond interest and retirement fund; that this fund is created by the Emergency Relief

Bond Issue act as one into which the general property tax, if and when collected, shall be paid; that there is no provision for the payment of any other tax into this fund, and that the appropriation is therefore void. The act introduced as House Bill No. 913, expressly provides that the bonds in question, principal and interest, shall be paid out of amounts set aside from the allotments to counties under the provisions of the Motor Fuel Tax law. Reference is further made in the terms of that act to the proportion of a county's allotment which shall be reserved for the purpose of the appropriation. When the whole of the pertinent provision of the appropriation act is considered, the legislative intent is clear and definite, and the reference to an emergency relief bond interest and retirement fund creates neither ambiguity nor uncertainty. *Gage* v. *City of Chicago*, 201 Ill. 93; *Loverin* v. *McLaughlin*, 161 id. 417; Endlich on Interpretation of Statutes, sec. 295.

The amendment of section 9 of the Motor Fuel Tax law to conform to the fourth act, the appellant insists, constitutes an unlawful diversion of the portion of the privilege tax allotted to the several counties for State aid road purposes. To sustain this contention, the appellant argues that the Motor Fuel Tax law, as originally enacted, was part of a legislative plan for financing the construction of State aid roads and that no subsequent General Assembly has the power, by amending the appropriate section, to change the purpose for which funds collected by authority of that act may be expended. The act originally provided that money allotted to the several counties should be used, as the counties might desire, for one or more of the following purposes: First, to retire bonds issued or to pay obligations incurred by a county to construct State aid roads in accordance with section 15$d$ of article 4 of the Road and Bridge act, approved June 27, 1913; second, for the construction of designated State aid roads in the manner approved by and under the supervision of the depart-

ment of public works and buildings; and third, with the approval of that department, to maintain roads and bridges constructed in accordance with the provisions of the foregoing subdivision. The Road and Bridge act, approved June 27, 1913, which authorized the construction and improvement of roads and bridges at the joint expense of the State and any county or counties, and which designated such highways as State aid roads, became effective July 1, 1913. Sixteen years later the Motor Fuel Tax law was made a part of the law of this State. Before the enactment of the statute imposing a tax upon the privilege of operating motor vehicles on the public highways, the funds required for the construction and improvement of State aid roads were derived from other sources. The revenues so produced are or may be made available and recourse may be taken thereto whenever necessary to carry on the construction and improvement of State aid roads. Any disposition for a public purpose other than the allotment of a portion of the privilege tax to the several counties might have been made by the General Assembly, and that department of the State government at any time may amend or even repeal the Motor Fuel Tax law. The tax imposed by it, when collected, becomes public money and may be applied to such purposes as the legislature from time to time may determine.

Finally, the appellant contends that the application of funds derived from the tax upon the privilege of operating motor vehicles upon public highways to the payment of emergency relief bonds impairs the obligation of contracts entered into by counties when they issued bonds to obtain money to build State aid roads. Section 15d of article 4 of the Road and Bridge act, approved June 27, 1913, empowers any county board, after obtaining the approval of the Department of Public Works and Buildings, to construct, out of available county funds, State aid roads theretofore selected and designated. Any county board is authorized

by the same section to issue bonds of the county for the purpose of constructing such roads after the question of issuing the bonds has been submitted to and approved by the legal voters of the county at a general or special election. Section 12 of article 9 of the constitution provides that any county, city, school district or other municipal corporation incurring any indebtedness shall before, or at the time of doing so, provide for the collection of a direct annual tax sufficient to pay the interest on such debt as it falls due and also to pay and discharge the principal within twenty years from the time the debt was contracted. There is no constitutional requirement that money derived from sources of revenue other than such a direct annual tax shall be pledged to the payment of bonds issued by a municipal corporation.

Section 8 of the Motor Fuel Tax law provides that all moneys received by the Department of Finance under the act shall be deposited in a special fund in the State treasury to be known as the motor fuel tax fund; that as moneys are so deposited, a sufficient amount shall be reserved to defray the cost of administering the act and to pay the refunds allowed by section 13, and that of the remainder, one-third shall be apportioned to the several counties of the State. Section 9 specifies that the share allotted to the several counties shall be disbursed in the following order: First, to pay the interest on, and the maturing principal of, the emergency relief bonds issued by the State in accordance with the fourth of the enumerated acts; second, to pay the interest on, and the maturing principal of, the bonds issued under the provisions of "An act authorizing counties to issue bonds for the relief of the unemployed and destitute, and providing for the use and expenditure of the proceeds thereof" (Cahill's Stat. 1933, p. 289; Smith's Stat. 1933, p. 866), and third, the remainder for any one or more of seven purposes as the several counties may desire. One of these purposes is the payment of bonds issued

or obligations incurred by a county to construct State aid roads in accordance with section 15d of article 4 of the Road and Bridge act, approved June 27, 1913. Section 9 of the Motor Fuel Tax law does not require a county to use the money apportioned to it under section 8 to retire bonds issued or obligations incurred to enable it to build State aid roads. After the payment, first, of emergency relief bonds issued by the State, and second, of those issued by the county, the application of the remainder of the allotment is optional to the extent that the county may use it for any one or more of the seven purposes specified in section 9. The county may elect to apply the whole of the remainder to one or several of the purposes defined other than the payment of bonds issued or obligations incurred by the county in the construction of State aid roads. Since the exercise of the county's option may divert the whole of the remainder of the allotment from the payment of such bonds or obligations, the contractual relationship asserted by the appellant cannot arise and a non-existent obligation cannot be impaired.

The charge that a contractual obligation is impaired fails for another reason. The tax upon the privilege of operating motor vehicles on the public highways is a State, and not a local, tax. The State has neither assumed any obligation to continue allotments of a portion of that tax to the several counties, nor has it been subjected to any liability upon or in connection with the bonds issued or obligations incurred by the counties for the purpose of constructing State aid roads. The legislature may at any time amend the Motor Fuel Tax law to provide for the expenditure of the entire proceeds of the tax by the State. In such a situation, participation by the several counties in any part of such proceeds will be withdrawn. Indeed any assumption by the State of liability for the payment of bonds issued by a county would violate section 20 of article 4 of the constitution which provides, "The State shall

never pay, assume or become responsible for the debts or liabilities of, or in any manner give, loan or extend its credit to or in aid of any public or other corporation, association or individual."

The decree of the circuit court is affirmed.

*Decree affirmed.*