MICHIGAN SHERIFFS' ASSOCIATION v DEPARTMENT OF
TREASURY

1. STATUTES—CONSTITUTIONAL LAW—TITLE-OBJECT CLAUSE—APPRO-
   PRIATIONS ACT—BUDGETARY PROCESS—INTERFUND TRANSFERS.
   A capital outlay appropriations act which transfers money from
   the Marine Safety Fund to the State Waterways Fund does not
   violate the title-object clause of the state constitution although
   the title to the act does not mention a transfer, where the title
   does mention implementation of the act through the budgetary
   process and where interfund transfers are a normal and neces-
   sary part of the budgetary process (Const 1963, art 4, § 24, 1975
   PA 246).

2. STATUTES—CONSTITUTIONAL LAW—TITLE-OBJECT CLAUSE—SEVERA-
   BILITY.
   Language in a capital outlay appropriations act which states a
   purpose which is foreign to the object stated in the title may be
   severed and the act sustained as constitutional under the title-
   object clause of the state constitution, where the offending
   language is only a half sentence, is hardly the subject matter
   for a separate statute, and constitutes only an insignificant
   portion of the statute (Const 1963, art 4, § 24, 1975 PA 246).

3. STATUTES—CONSTITUTIONAL LAW—TITLE-OBJECT CLAUSE—SEVERA-
   BILITY.
   Severability is generally not available to save an act from a
   violation of the title-object clause of the state constitution
   (Const 1963, art 4, § 24).

4. STATUTES—CONSTITUTIONAL LAW—TITLE-OBJECT CLAUSE—STRIK-
   ING LANGUAGE FROM ACT.
   An act should be sustained as constitutional if, by striking from

REFERENCES FOR POINTS IN HEADNOTES
[1–4] 73 Am Jur 2d, Statutes § 100 *et seq.*
[2–4] 16 Am Jur 2d, Constitutional Law § 181 *et seq.*
   73 Am Jur 2d, Statutes § 383.
[5] 2 Am Jur 2d, Administrative Law § 252 *et seq.*
[6–10] 2 Am Jur 2d, Administrative Law § 233 *et seq.*
   63 Am Jur 2d, Public Funds §§ 1–5, 9–11.
[7] 63 Am Jur 2d, Public Funds § 56.

the act all that relates to an object not indicated by the title, that which is left is complete in itself, sensible, and wholly independent of that which is rejected (Const 1963, art 4, § 24).

5. STATES—LEGISLATURES—BINDING SUCCEEDING LEGISLATURES—CONTRACTS—CONCESSIONS—CONSIDERATION.

Legislatures cannot bind the hands of their successors where elements of a contract, concession and consideration do not appear.

6. STATES—SPECIAL FUNDS—STATUTES—DIVERTING TO OTHER PURPOSE.

A special fund created or set aside by statute for a particular purpose or use generally *must be administered and expended in accordance with the statute* and may be applied only to the purpose for which it was created or set aside, and not diverted to any other purpose or transferred to any other fund.

7. STATES—SPECIAL FUNDS—TRANSFER OF FUNDS—LEGISLATURE—APPROPRIATIONS—LEGISLATIVE CONTROL—CONSTITUTION—OBLIGATION OF CONTRACTS—TRUST FUND.

The Legislature has power to transfer to another fund or appropriate to another purpose any surplus which may remain in a special fund after the accomplishment of the purpose for which it was established, and, in general, whether or not the purpose for which a special fund was created has been accomplished, such fund *may be diverted by statute to another and different purpose* as long as it remains subject to legislative control; but the Legislature cannot authorize the diversion of a special fund where such diversion would conflict with a provision of the constitution controlling such fund, or would impair the obligation of a contract or constitute a breach of trust, although a surplus in a trust fund may be diverted therefrom.

8. STATES—SPECIAL FUND—EXECUTIVE-ADMINISTRATIVE ACTION—LEGISLATIVE ACTION—CONSTITUTION—OBLIGATION OF CONTRACTS.

The diversion of money from a special fund by executive or administrative action is generally prohibited while the same transfer by legislative action is generally permissible unless the diversion would conflict with a constitutional provision or would impair the obligation of contract.

9. STATES—SPECIAL FUNDS—LEGISLATURE—TRANSFER OF FUNDS—RESTRICTIONS—CONSTITUTIONAL LAW—CONTRACTS—TRUST FUNDS.

A fund is "special" and immune from diversion by a subsequent

legislative transfer only when the diversion would conflict with a constitutional provision or impair a contractual relationship such as arises where the state holds trust or retirement funds, holds funds obtained to repay specific indebtedness such as revenue bonds, or holds funds obtained for a specific and no other purpose.

10. STATES—LEGISLATURE—MARINE SAFETY FUND—STATE WATERWAYS FUND—TRANSFER OF MONEY—APPROPRIATION ACTS.

The Legislature through an appropriations act may transfer money from the Marine Safety Fund to the State Waterways Fund without formal amendment of the statute which established the Marine Safety Fund where (1) the funds both relate to the common function of boating and marine activities, (2) the transfer concerns money which the funds receive from a common source, *i.e.* boating registration fees, (3) the fund into which the transfer is being made is subject to legislative control, (4) no constitutional prohibition to the transfer exists, and (5) no trust or contractual relationship exists (MCLA 281.1021; MSA 18.1287[21]).

Appeal from Ingham, Jack W. Warren, J. Submitted March 9, 1977, at Lansing. (Docket No. 29369.) Decided May 4, 1977.

Complaint by Michigan Sheriffs' Association, Jack P. Foster, Charles White, Rodney Lane, Keith Wilhelm, Kenneth L. Preadmore and Ingham County against the Michigan Department of Treasury and the Michigan Department of Natural Resources for a judgment declaring illegal the Legislature's transfer of money from the Marine Safety Fund to the State Waterways Fund. Judgment for defendants. Michigan Sheriffs' Association, Jack P. Foster, Charles White, Rodney Lane and Keith Wilhelm appeal. Affirmed.

*Farhat, Burns & Story, P. C.* (by *E. Michael Stafford*), for Michigan Sheriffs' Association, Jack P. Foster, Charles White, Rodney Lane, and Keith Wilhelm.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Thomas J. Emery* and *Norbert G. Jaworski,* Assistants Attorney General, for defendants.

Before: D. F. Walsh, P. J., and Allen and N. J. Kaufman, JJ.

Allen, J. Where funds are collected by the state pursuant to a statute designating a specific purpose for which the sums so collected may be spent, may the Legislature thereafter apply a portion of the sums so collected to another purpose? This question of apparent first impression is raised by the Ingham County Circuit Court ruling in defendants' favor on plaintiffs' action challenging the legality of the Legislature's transfer of $900,000 from the Marine Safety Fund to the State Waterways Fund.

The Marine Safety Fund (MSF) was established by 1967 PA 303; MCLA 281.1001 *et seq.;* MSA 18.1287(1) *et seq.* That act provides for the registration of motor boats and the collection of fees for such registration. Section 21 allocates 25% of the revenues collected to the State Waterways Fund (SWF), MCLA 281.1021; MSA 18.1287(21), and:

"The balance of the revenues shall be deposited to the credit of the marine safety fund. All moneys now in the state treasury to the credit of the watercraft law enforcement fund are transferred to the marine safety fund. The legislature shall appropriate from the marine safety fund *for water safety education programs and for the administration and enforcement of this act,* including state aid to counties, but not in excess of revenues credited to the marine safety fund." (Emphasis supplied.)

Moneys thus deposited in the MSF are appropriated each year in an amount determined by the Legislature for the conduct of marine safety programs in concert with county sheriffs' departments. Under the cost sharing formula, the state provides two-thirds and the county one-third of the funds required for the conduct of the program. Basically, the safety education program mandated by the statute is run by the county sheriffs' departments that perform enforcement, patrol and education of children in boating safety.[1]

The SWF was established in 1947 under the Michigan waterways commission act, MCLA 281.501 *et seq.;* MSA 3.534(1) *et seq.* It is administered by the Michigan State Waterways Commission whose power and duty is to acquire, construct and maintain marinas and harbor facilities.[2] The commission's primary source of revenue is 1.25% of all gasoline taxes collected by the state which sums are in turn annually credited to the SWF. Additionally, the SWF is augmented by the 25% of boating fee collections heretofore referred to.

In 1975, the MSF contained a surplus over and above the sums which the Legislature determined were necessary for conducting a marine safety program. Accordingly, the Legislature, in enacting the state budget for fiscal 1975–76, provided in the budget bill commonly referred to as the capital outlay bill that $900,000 was transferred out of the MSF and into the SWF and, in turn, appropriated for the construction of three harbor facilities:

"Sec. 7. The department of natural resources shall

---

[1] Sheriffs departments, staffed with some 400 trained marine deputies and owning 250 boats, participate in the program.

[2] "(a) To acquire, construct, and maintain harbors, channels, and facilities for vessels in the navigable waters lying within the boundaries of the state of Michigan." MCLA 281.504; MSA 3.534(4).

transfer $900,000 from the marine safety fund to the waterways fund to provide for boating safety and to facilitate enforcement of the water safety laws of the state. Subject to the provisions of the waterways section of this act, there is appropriated from the waterways fund of the state for construction of boat launching and refuge facilities for the fiscal year ending June 30, 1976, the sum of $900,000 or as much thereof as may be necessary and in the following amounts:

DEPARTMENT OF NATURAL RESOURCES
 Waterways
  Public Access Site and Refuge Facilities

| | |
|---|---|
| Selfridge field launching facility—Lake St. Clair, Macomb county | $ 500,000 |
| Portage lake marina—boating facilities expansion, Houghton county | 300,000 |
| Village of Baraga marine—initial development—Lake Superior, Baraga county | 100,000 |
| Subtotal................ | $ 900,000 |
| Less marine safety fund . . | (900,000) |
| TOTAL WATERWAYS FUND ........ | $-0-" |

1975 PA 246.

Plaintiffs level three attacks on the validity of the transfer made under § 7, the third of which we find unnecessary to address.[3]

I. *Is the Transfer In Violation of Article 4, § 24 of the Constitution of 1963, requiring that "No Law Shall Embrace More Than One Object Which Shall Be Expressed in Its Title"?*

The title to 1975 PA 246 describes the bill as being an act to provide for the state's capital

---

[3] The third issue raised by plaintiffs is whether the contested transfer constitutes an amendment by implication of the statute which provides that 75% of the boat registration fees shall be credited to the Marine Safety Fund and 25% credited to the State Waterways Fund. MCLA 281.1021; MSA 18.1287(21). Since both plaintiffs and defendants agree that it is not an amendment by implication, we find it unnecessary to discuss the issue.

outlay program for the fiscal year ending June 30, 1976.[4] Basically, plaintiffs assign two respects in which the transfer violates the constitutional provision. First, plaintiffs contend that since the title contains no mention of a transfer, the transfer is invalid. The trial court rejected this claim stating that the title included implementation "within the budgetary process" and since there was no showing that transfers were not part of the budgetary process, the transfer itself would be deemed to be within the title of the act. We agree with the trial judge. Transfers are not only a normal but also a necessary part of the budget process. The appropriation bills which encompass the constitutionally mandated annual budget contain frequent mention of transfers. For example, within the Governor's recommended budget for fiscal 1975–76 of $6.2 billion, interfund transfers of $1.012 billion were proposed. In the preceding fiscal year, interfund transfers amounted to $972 million, of total appropriations of $5.650 billion.[5] To require the title of each appropriation act to refer to each transfer would be pointless. See *Detroit Board of Street Railway Commissioners v Wayne County,* 18 Mich App 614, 622–623; 171 NW2d 669 (1969); *People v Barber,* 14 Mich App 395, 407; 165 NW2d 608 (1968).

---

[4] "An act to provide for a capital outlay program; to set forth the provisions for its implementation within the budgetary process; to make appropriations for planning and construction at state institutions and the acquisition of land; to provide for the elimination of fire hazards at such institutions; to provide for certain special maintenance, remodeling, alteration, renovation or demolition of and additions to projects at state institutions; to provide for elimination of occupational safety and health hazards at state agencies and institutions; to provide for the award of contracts; and to provide for the expenditure thereof under the supervision of the director of the department of management and budget and the state administrative board; and to rescind capital outlay appropriations in parts of certain acts."

[5] Budget Message of the Governor for Fiscal Year 1975–76, p 67.

Plaintiffs' second ground for contending that the transfer violates the title-object provision of the Constitution is more sophisticated and has greater merit. As plaintiffs point out, the transfer was not a bare transfer of $900,000 but was accompanied with restrictive language that it was a transfer "to provide for boating safety and to facilitate enforcement of the water safety laws of the state". With some justification, plaintiffs argue that the purpose of the bill is to appropriate for capital outlay projects but the Legislature has appropriated for a purpose quite different than capital outlay construction. As was stated in the trial court's written opinion:

"It is the purported purpose of the transfer which appears to be beyond the scope of the title of the act.

"Furthermore, the purported purpose of the transfer first found in section 7 (to provide for boating safety and water safety law enforcement) is contradictory to the purpose of the transfer expressed in section 1 of the act (to finance capital outlay projects) as well as the purpose of the transfer later expressed in section 7 itself (to finance * * * capital outlay projects)." Trial court opinion, p 7.

The trial court solved the dilemma by holding that since a bare transfer of the funds would not in itself have been violative of article 4, § 24 of the Constitution, and since the true purpose of the transfer was clearly expressed as being for the construction of three specifically designated boating facilities, the offending language "to provide for boating safety and to facilitate enforcement of the water safety laws of the state" was a legal nullity and of no force and effect. Plaintiffs contend that § 7 must be read as a whole as appropriating a specific sum of money for a specific purpose

and accordingly the purpose of § 7 may not be severed from the appropriation.

For reasons in part the same and in part different from the reasons assigned by the trial court, we hold that the appropriation may be severed from the offending language and the appropriation sustained. To begin with, we find no incompatibility between the purpose stated in the title of 1975 PA 246 and the words "to provide for boating safety".[6] The obvious purpose for the construction of marinas and boating facilities is to provide places of refuge and safety for watercraft. Thus, it is only the remaining 12 words "and to facilitate enforcement of the water safety laws of the state" which announce a purpose foreign to the object stated in the title. Should the entire transfer and subsequent appropriation fail because of these 12 words? We definitely think not. When § 7 is read as a whole it is unmistakably clear that the Legislature intended two things: (1) to transfer $900,000 out of the MSF and into the SWF; and (2) to appropriate the $900,000 thus placed in the SWF for three capital outlay projects. To us the offending 12 words are so incompatible with the clear intent of § 7, we conclude they are the product of hasty or careless draftsmanship. Quite properly, the language was stricken and declared of no effect by the trial court. This is not a situation governed by *Advisory Opinion on Constitutionality of 1975 PA 227,* 396 Mich 123; 240 NW2d 193 (1976), where the Supreme Court declared that severability was not available in instances challenging constitutionality for violation of the title-object provision.[7] There, the body of the statute set out at

---

[6] "Boating safety" as used in § 7 is not to be confused with the words "for water safety education programs" as used in § 21 of the Marine Safety Act, *supra.*

[7] "Severability is not available in instances challenging constitu-

great length and detail multiple purposes not encompassed within the title and any one of which could properly be embraced in a separate statute. In the instant situation the offending half sentence is not only *de minimus* and hardly the subject matter for a separate statute, it is inconsistent with the true purpose of the statute when read as a whole. Basically, we conclude that the disputed language is so inconsistent with the balance of the section and so poorly expressed that it fails to set forth a purpose inconsistent with the object expressed in the title of the act. But assuming *arguendo* we are wrong in this conclusion, we hold that the offending words may properly be stricken under authority of *Graham v Muskegon County Clerk,* 116 Mich 571; 74 NW 729 (1898). In that case, the title of the act referred only to "the incorporation of ecclesiastical bodies" and § 10 of the body of the statute referred to "other societies for the purpose of diffusing moral or religious knowledge". The statute was challenged on the ground that § 10 conflicted with Const 1850, art 4, § 20, which stated that no law shall embrace more than one subject which shall be embraced within its title. The Court sustained the statute by severing § 10 from the balance of the act, saying:

"[I]t is not essential, for a determination of this case, to decide whether societies for the diffusion of moral and religious knowledge may be properly designated as 'ecclesiastical bodies'. The rule is that if, by striking from an act all that relates to an object not indicated by the title, that which is left is complete in itself, and sensible, and wholly independent of that which is rejected, it must be sustained as constitutional." *Graham, supra* at 573.

tionality on this ground. A prohibition against the passage of an act relating to different objects expressed in the title makes the whole act void." *Advisory Opinion, supra* at 130–131.

The same principle of construction was applied in *Klatt v Wayne Probate Judge,* 159 Mich 203; 123 NW 542 (1909), to sustain the constitutionality of an act containing a provision not expressed in its title. Unlike *Advisory Opinion on Constitutionality of 1975 PA 227, supra,* the offending language stricken in *Graham* and *Clark* was, as is here, an insignificant portion of the statute.

II. *Where Fees Are Collected By the State and Placed in a Fund (MSF) from Which the Legislature "Shall Appropriate for Water Safety Education Programs", May the Legislature Thereafter Apply a Portion of the Sums Collected For Another Purpose?*

Although there is considerable authority for the proposition that one legislature may not tie the hands or bind a successor legislature, *Detroit v Detroit & Howell Plank Road Co,* 43 Mich 140; 5 NW 275 (1880), *Cooper, Wells & Co v City of St Joseph,* 232 Mich 255, 258; 205 NW 86 (1925), *Atlas v Wayne County Board of Auditors,* 281 Mich 596, 599; 275 NW 507 (1937), the factual situations involved therein are so different from the question involved here we find the authority of help only for the limitation expressed by Justice COOLEY in *Detroit v Detroit & Howell Plank Road Co, supra* at 145: "Legislators cannot thus bind the hands of their successors where the elements of contract, concession and consideration do not appear". With the possible exception of *Perry v Hogarth,* 261 Mich 526, 532; 246 NW 214 (1933),[8]

---

[8] The issue in *Perry, supra,* was whether hunting fees collected under 1929 PA 286 and, by said act, placed in the Game and Fish Protection Fund could be diverted by 1931 PA 325 stating that the tax due counties for state swamplands should be paid out of the Game and Fish Protection Fund. 1929 PA 286 specified the purposes for which the hunting fees placed in the Game and Fish Protection Fund were to be expended. The Court sustained the diversion, saying:

"We have no constitutional provision in this State providing that

no Michigan case speaks to the power of the Legislature to transfer to another fund moneys in a fund established for a particular purpose. Two paragraphs from 81 CJS, States, § 158, pp 1199–1200 speak directly to the point:

*"Disposition of special funds.* Where a special fund is created or set aside by statute for a particular purpose or use, it must be administered and expended in accordance with the statute, and may be applied only to the purpose for which it was created or set aside, and not diverted to any other purpose, or transferred from such authorized fund to any other fund.

"The legislature has power, however, to transfer to another fund or appropriate to another purpose any surplus which may remain in a special fund after the accomplishment of the purpose for which it was established, and, in general, whether or not the purpose for which a special fund was created has been accomplished, such fund may be diverted by statute to another and different purpose as long as it remains subject to legislative control; but the legislature cannot authorize the diversion of a special fund where such diversion would conflict with a provision of the constitution controlling such fund, or would impair the obligation of a contract or constitute a breach of trust, although a surplus in a trust fund may be diverted therefrom." (Footnotes omitted.)

It comes as no surprise that plaintiffs' brief cites the first paragraph, *supra,* while defendants' brief relies on the second paragraph. Careful examination discloses that paragraph one refers to executive-administrative actions whereas paragraph two pertains to legislative action.[9] The former (execu-

_____

moneys received from licenses shall be appropriated to a designated purpose." *Perry, supra,* at 532.

[9] Secondary authority in Michigan likewise fails to distinguish the greater restriction on executive power to transfer funds set aside for a particular purpose from the lesser restriction on the Legislature. The statement in 20 Michigan Law & Practice, State, § 16, p 530, while

tive) type transfer is generally prohibited whereas the latter (legislative) type transfer is within the power of the Legislature unless such diversion would conflict with a constitutional provision or would impair the obligation of contract.[10] *Michaels v Barrett,* 355 Ill 175; 188 NE 921 (1934), is factually closest to the instant situation. There, the Legislature had enacted a motor fuel tax and provided that the revenues derived therefrom should be used for the purpose of constructing and improving roads. Subsequently the Legislature, by amendment to the statute, diverted a portion of the revenues for emergency relief purposes. Responding to a claim that moneys collected for a specified purpose could not be diverted for another purpose, the Court stated:

"Any disposition for a public purpose other than the allotment of a portion of the privilege tax to the several counties might have been made by the General Assembly, and that department of the State government at any time may amend or even repeal the Motor Fuel Tax law. The tax imposed by it, when collected, becomes public money and may be applied to such purposes as the legislature from time to time may determine." *Michaels, supra* at 186.

More recently in *Department of Public Welfare v Haas,* 15 Ill 2d 204; 154 NE2d 265 (1958), the Illinois Court said:

---

perhaps applicable to executive actions, is not applicable to legislative actions. A legislature is not bound by a predecessor unless there is an element of contract present. *Detroit v Detroit & Howell Plank Road Co, supra.*

[10] For example, no part of the gasoline tax on fuels used to propel motor vehicles on highways could be diverted to the construction of marinas or launching facilities. Const 1963, art 9, § 9. Nor could any portion of the sales tax not going to local governments for education be so diverted. Const 1963, art 9, § 11. Nor could the Legislature so divert any portion of retirement funds since this would impair a contractual obligation.

"The fact that the legislature may provide that amounts, when collected, shall be placed in a certain fund does not ordinarily preclude a later General Assembly from ordering it paid into another fund or from abolishing the fund altogether."

We disagree with plaintiffs' argument that the MSF is a "special" or "restricted" fund so tied down and restricted when first established that, sans formal amendment thereof, even the Legislature is precluded from appropriating some moneys to another purpose. We note that the Marine Safety Act did not unequivocally restrict or earmark the MSF by adding the words "and for no other purpose" or language of similar intent. As noted by the trial court the Legislature has used much more restrictive language creating other funds.[11] Nor is the MSF classified as a trust fund or restricted fund in the statute concerning state funds and accounting. MCLA 21.101; MSA 3.606(1). Nor is it required that all the registration fees deposited in the MSF be appropriated. In our opinion a fund is not made "special" merely by designating a purpose for which it may be expended. A fund becomes "special" and immune from diversion by a subsequent legislative transfer only when the diversion would conflict with a constitutional provision or impair a contractual

[11] "It is true that the legislature can, and on occasion has, placed restrictions on itself and/or agencies and departments of this state as to what types of appropriations or expenditures may be made from certain funds. *See, e.g.,* Armory Building Fund (MCLA 32.171; .191 [MSA 4.731, 4.741] repealed by 1967 PA 1950, section 451); Michigan Aviation Matching Funds (MCLA 259.501; .505); Michigan Aviation Supplemental Matching Funds (MCLA 259.511; .513); State Water Pollution Control Fund (MCLA 323.111; .113, .113a) [MSA 3.533(51), 3.533(53), 3.533(53a)]; Bond Reserve Fund (MCLA 331.45) [MSA 14.1220(15)]; and Vietnam Veteran Era Bonus Fund (MCLA 35.1027; .1036) [MSA 4.1097(47), 4.1097(56)]." However, absent an element of contract or trust accompanying the collection of such funds, they remain subject to transfer by a subsequent Legislature.

relationship such as arises where the state holds trust or retirement funds, holds funds obtained to repay a specific indebtedness such as revenue bonds, or holds funds obtained for a specific and no other purpose.

The amount of the appropriation from the MSF rests in the discretion of the Legislature. To this we ascribe special significance. When the 75%–25% allocation of boating registration was made, the Legislature must have been cognizant that without some experience with the new law the Legislature would be unable to predict in advance whether in any given year more funds would be required for safety education type programs than for capital outlay marina and launching construction. One solution to the problem would be a formal amendment to the act changing the percentage allocation. But this would obviously be cumbersome and require frequent amendments. A more practical solution would be to leave the annual appropriation from each fund within the Legislature's discretion with the additional right to transfer funds from one account to another. If, as the record shows in the instant case, the MSF has more moneys than the Legislature determines is needed in the upcoming fiscal year and the SWF has less than the Legislature determines is reasonably required to meet state needs, a simple transfer from the one fund to the other is all that would be required.[12] We are not dealing here with a diversion between distinctly unrelated funds as, for example, a transfer from MSF to the Department of Social Services for operations or to the Department of Corrections for prison construction.

---

[12] We do not intend to imply hereby that any portion of the SWF derived from 1.25% of the gasoline tax could be transferred to the MSF. Our decision is limited to a transfer of revenues derived from boating registration fees.

We are dealing with a narrow transfer (a) between related funds each pertaining to the common function of boating and marine activities, and (b) of moneys derived from the same source, *viz.:* boating registration fees. Given these circumstances we are not convinced that the Legislature intended that all of the revenues placed in the MSF should remain in the fund and that no portion could be transferred to the SWF.

In summary, in the absence of a constitutional prohibition or a trust or contractual relationship, none of which appear here, the law does allow a transfer by the Legislature from a fund established for a designated purpose into a fund whose purpose is different, providing that the fund into which the transfer is made is subject, as here, to legislative control. The special circumstances under which the initial apportionment was made between the Marine Safety Fund and the State Waterways Fund and the commonality of purpose for which appropriations from each fund were authorized persuades this Court that in the instant case the Legislature fully intended to retain the power of transfer.

Affirmed, no costs, a public question being involved.