**Douglas H. BARBER; Heggem–Lundquist Paint Company, a Colorado corporation; and Rick Kerber, d/b/a Kerber's Oil Company, Plaintiffs–Appellants,**

v.

**Bill RITTER, Jr., as Governor of the State of Colorado, and Cary Kennedy, as Treasurer of the State of Colorado, Defendants–Appellees.**

No. 05CA0752.

Colorado Court of Appeals,
Div. II.

March 22, 2007.

Certiorari Granted Nov. 13, 2007.

Head & Associates, P.C., John F. Head, Denver, Colorado, for Plaintiffs–Appellants.

John W. Suthers, Attorney General, Maurice G. Knaizer, Deputy Attorney General, Monica Márquez, Assistant Attorney Gener-

al, Denver, Colorado, for Defendants–Appellees.

Larry W. Berkowitz, Brad D. Bailey, Littleton, Colorado, Amici Curiae for City of Littleton.

Opinion by Judge ROTHENBERG.

In this case involving the Taxpayer's Bill of Rights (TABOR), Colo. Const. art. X, § 20, and Colo. Const. art. XI, §§ 3–4, plaintiffs, Douglas H. Barber, Rick Kerber, and Heggem–Lundquist Paint Company (collectively, the Taxpayers), appeal the trial court's order dismissing their general claims and Heggem–Lundquist's individual claims, and the summary judgment in favor of defendants, former Governor Bill Owens and former State Treasurer Mike Coffman (the state defendants). After the notice of appeal was filed, a notice of substitution was filed pursuant to C.A.R. 43(c)(1), reflecting that Bill Ritter, Jr. has succeeded Bill Owens as Governor and Cary Kennedy has succeeded Mike Coffman as Treasurer, and the caption was changed accordingly. We affirm in part, reverse in part, and remand with directions.

The primary issue here is this: May the legislature transfer to the general fund cash funds that were collected by the state and designated by statute for specific purposes, or do such transfers violate TABOR and Colo. Const. art. XI, §§ 3–4? With limited exceptions described below, we hold that the legislative acts at issue here which authorized such transfers do not violate TABOR or Colo. Const. art. XI, §§ 3–4.

## I. Background

Between 2001 and 2004, during an economic downturn in Colorado, the General Assembly enacted a series of acts that were signed by the governor to address general fund revenue shortfalls. These acts directed the state treasurer to transfer to the state's general fund over $442 million from thirty-one cash funds, which had been established by the General Assembly for specific purposes.

The Taxpayers filed this action in August 2004, asserting that (1) the transfers of these cash funds represented a "new tax" or a "tax policy change causing a net tax revenue gain" and occurred without voter approval in violation of TABOR; (2) some of the funds were "public trusts," and therefore, the state as trustee had an obligation to repay the money it had transferred; and (3) the transfers created an unconstitutional "debt" in violation of Colo. Const. art. XI, §§ 3–4. The Taxpayers sought a declaratory judgment invalidating these acts and an order requiring the legislature to return the money to the funds.

Apart from their general assertions based on their status as Colorado taxpayers, Barber, Kerber, and Heggem–Lundquist also asserted individual claims alleging that transfers from the real estate recovery fund, the petroleum storage tank fund, the major medical fund, the subsequent injury fund, and the workers' compensation cash funds, caused them economic injury.

The state defendants admit they took drastic measures, including these cash transfers, to enhance revenues to balance the state budget as required by Colo. Const. art. X, § 16. However, they maintain that the transfers were properly made and did not violate the Colorado Constitution. They point out that the General Assembly has enacted similar legislation at least twice in the past when the state faced fiscal shortfalls. In 1983, the legislature transferred money from the lottery fund, the severance tax trust fund, and sales taxes designated for the highway users tax trust fund, see 1983 Colo. Sess. Laws, ch. 438, § 6 at 1519; and in 1987, it transferred money from the water conservation board construction fund and the severance tax trust fund to prevent shortages in the general fund. See 1987 Colo. Sess. Laws, ch. 199, §§ 2 & 3 at 1108.

The parties filed cross-motions for summary judgment, and after considering the parties' submissions, the trial court dismissed the Taxpayers' general claims, concluding they lacked standing to raise them. The court concluded Barber had standing to contest the constitutionality of the transfer from the real estate recovery fund, and Kerber had standing to challenge the constitutionality of the transfer from the petroleum storage tank fund. However, the court dismissed Heggem–Lundquist's specific claims chal-

lenging the transfer from the major medical fund, the subsequent injury fund, and the workers' compensation fund, concluding it failed to show economic injury and therefore lacked standing to bring those claims.

After dismissing most of the Taxpayers' claims for lack of standing, the trial court nevertheless addressed the merits and concluded that the transfers did not violate the Colorado Constitution, and that even if the transfers were improper, the court lacked authority to grant the relief sought by the Taxpayers.

## II. Moot Claims

■ Initially, we conclude some of the Taxpayers' claims are moot. A case is moot when a judgment, if rendered, would have no practical legal effect upon an existing controversy. *Campbell v. Meyer*, 883 P.2d 617 (Colo.App.1994).

■ We will not consider and rule on the merits of an appeal when the issues presented to the trial court have become moot due to subsequent events. *Campbell v. Meyer, supra.* "The duty of this court, as of every other judicial tribunal, is to decide actual controversies by a judgment which can be carried into effect, and not ... to declare principles or rules of law which cannot affect the matter in issue before it." *Barnes v. Dist. Court*, 199 Colo. 310, 312, 607 P.2d 1008, 1009 (1980) (quoting *People v. Dist. Court*, 78 Colo. 526, 530, 242 P. 997, 998 (1925)).

■ Barber is a real estate broker licensed by the Colorado Division of Real Estate. He alleged that he was injured by the transfer of funds from the real estate recovery fund to the general fund, and requested an order directing repayment of funds into the real estate recovery fund. However, it is undisputed that the real estate recovery fund and the surcharge imposed on real estate licenses have been abolished, there is no fund in existence to which to return transferred monies, and there is no longer an existing controversy regarding this claim. *See* Colo. Sess. Laws 2005, ch. 177, § 12–61–301 at 622.

■ Kerber does business as Kerber's Oil Company. He buys fuel from a large oil company and delivers it in bulk to consumers. He pays an environmental response surcharge on every tank of fuel he purchases, which surcharge goes to the petroleum storage tank fund. *See* §§ 8–20–206.5, 8–20.5–103(1)(d), C.R.S.2006 (providing funding for the remediation of contamination caused by leaking petroleum storage tanks). The amount of the surcharge paid by Kerber and others depends on the balance in the fund.

Kerber alleged that he was injured by the transfer of money from that fund to the general fund, and he requested an order requiring repayment to the petroleum storage tank fund. However, it is undisputed that the funds taken from the petroleum storage tank fund have been repaid. *See* §§ 8–20.5–103(2)(b)(II), 24–75–217, C.R.S. 2006. Hence, there is no existing controversy for us to decide as to this claim.

We therefore address whether the Taxpayers and Heggem–Lundquist have standing to challenge the transfers of the remaining twenty-nine cash funds.

## III. Standing

The Taxpayers contend the trial court erred in concluding they lacked standing to challenge, as unconstitutional, the transfers of the cash funds because they did not directly pay into those funds. We agree.

■ Standing is a question of law we review de novo. *Corsentino v. Cordova*, 4 P.3d 1082 (Colo.2000). To establish standing to sue, the plaintiff must show (1) an injury in fact (2) to a legally protected interest. *Wimberly v. Ettenberg*, 194 Colo. 163, 570 P.2d 535 (1977).

There are at least three distinct forms of standing: taxpayer standing, individual standing, and organizational standing. *See Women's Emergency Network v. Bush*, 323 F.3d 937, 943 (11th Cir.2003) (citing *Doremus v. Bd. of Educ.*, 342 U.S. 429, 434, 72 S.Ct. 394, 397, 96 L.Ed. 475 (1952); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992); *Brotman v. E. Lake Creek Ranch, L.L.P.*, 31 P.3d 886 (Colo.2001)(court concluded plaintiff lacked standing to bring the action (1) as an

adjacent landowner, (2) as a taxpayer, or (3) as the beneficiary of a federal trust, and discussed the different requirements for each type of standing)).

The Colorado Supreme Court has construed the law to provide "broad taxpayer standing in the trial and appellate courts." *Ainscough v. Owens*, 90 P.3d 851, 856 (Colo. 2004); *see Conrad v. City & County of Denver*, 656 P.2d 662, 668 (Colo.1982).

### A. Injury in Fact

"The 'injury-in-fact' requirement is dictated by the need to assure that an actual controversy exists so the matter is a proper one for judicial resolution." *Conrad, supra*, 656 P.2d at 668 (concluding taxpayer had standing to challenge the constitutionality of the use of public funds to display nativity scene on the steps of the city and county building).

■ "To determine whether there is an injury-in-fact, we accept as true the allegations set forth in the complaint." *Ainscough, supra*, 90 P.3d at 857 (citing *Dunlap v. Colo. Springs Cablevision, Inc.*, 829 P.2d 1286, 1289 (Colo.1992)).

The alleged injury may be tangible, like an economic loss or physical harm, or it may be intangible, like the government's violation of legally created rights. *Ainscough, supra; Olson v. City of Golden*, 53 P.3d 747, 750 (Colo.App.2002) (concluding Urban Renewal Law does not reflect a legislative intent to grant taxpayers the right to enforce § 31–25–106(1), C.R.S.2006).

Colorado courts have recognized a wide variety of intangible injuries that may be asserted by taxpayers, including aesthetic and environmental injuries, *City of Greenwood Village v. Petitioners for Proposed City of Centennial*, 3 P.3d 427 (Colo.2000) (citing *Sierra Club v. Morton*, 405 U.S. 727, 734, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972)); injuries to the General Assembly's power of appropriation, *see Colo. Gen. Assembly v. Lamm*, 700 P.2d 508, 510 (Colo.1985); injuries caused by governmental preference for a particular religion, *Conrad, supra;* injuries based upon alteration of a particular form of government, *Howard v. City of Boulder*, 132 Colo. 401,

290 P.2d 237 (1955); *Colo. State Civil Serv. Employees Ass'n v. Love*, 167 Colo. 436, 448 P.2d 624 (1968); and injuries to taxpayers based upon unlawful expenditures of state funds, even without a direct economic injury, *Dodge v. Dep't of Soc. Servs.*, 198 Colo. 379, 600 P.2d 70 (1979) (concluding taxpayer had standing to challenge the constitutionality of the use of state funds to finance non-therapeutic abortions); *Rocky Mountain Animal Defense v. Colo. Div. of Wildlife*, 100 P.3d 508, 513 (Colo.App.2004)(nonprofit corporation organized to enforce laws protecting wildlife and human-imposed suffering of animals had standing to challenge agency action poisoning prairie dogs, allegedly in violation of Amendment 14, which protects Colorado wildlife from inhumane and indiscriminate methods of killing; "[e]nvironmental organizations have a legitimate role in ensuring the proper interpretation and implementation of such laws").

■ In cases involving a taxpayer's standing, general allegations of injury are sufficient, and a plaintiff has standing as long as the taxpayer "argues that a governmental action that harms him [or her] is unconstitutional." *Ainscough, supra*, 90 P.3d at 856. "Generally, the one who bears the financial burden of a tax is a party aggrieved and thus has standing to challenge an assessment." *Hughey v. Jefferson County Bd. of Comm'rs*, 921 P.2d 76, 78 (Colo.App.1996); *see Conrad, supra*, 656 P.2d at 668. "[E]ven where no direct economic harm is implicated, a citizen has standing to pursue his or her interest in ensuring that governmental units conform to the state constitution." *Nicholl v. E–470 Pub. Highway Auth.*, 896 P.2d 859, 866 (Colo.1995).

### B. Legally Protected Interest

The legally protected interest also may be tangible, such as a property right, or it may be intangible, such as an interest that the government acts in a manner that conforms to the Constitution. *See Nicholl, supra*, 896 P.2d at 866. The supreme court has held that taxpayers have an economic interest in having general tax dollars spent in a constitutional manner. *Ainscough, supra*, 90 P.3d at 856 ("[L]egally protected rights encom-

pass all rights arising from constitutions, statutes, and case law."); *Conrad, supra.*

TABOR also includes specific language that confers upon parties a legally protected interest to enforce its provisions. It provides: "Individual or class action enforcement suits may be filed and shall have the highest civil priority of resolution." Colo. Const. art. X, § 20(1). This language has been interpreted to confer a legally protected interest to enforce the provisions of TABOR, which satisfies the second standing requirement. *Nicholl, supra,* 896 P.2d at 866 ("Although [TABOR], itself, did not create 'rights' vested in Colorado's taxpayers but rather imposes 'limitations on the spending and taxing power[s] of state and local government,' under the terms of [TABOR], Nicholl may bring an enforcement action as an individual taxpayer." (citation omitted) (quoting *Bickel v. City of Boulder,* 885 P.2d 215, 225 (Colo.1994))).

### C. Application to This Case

 Accepting the allegations in the complaint as true and applying the broad taxpayer standing standard articulated by our supreme court, we conclude the Taxpayers have standing to challenge the constitutionality of the use of funds, and to present their argument that a vote of the electorate was required before the cash transfers could be effectuated. *See Nicholl, supra; Conrad, supra; Dodge, supra.* This standing exists because the Taxpayers have an interest in having general tax dollars spent in compliance with TABOR and Colo. Const. art. XI, §§ 3 and 4. If the Taxpayers here were determined to have no standing, we do not know who else could bring these constitutional challenges.

In reaching our conclusion, we acknowledge that taxpayer standing cases have generally involved *expenditures* by the legislature, whereas, here, the Taxpayers are challenging *transfers* of money from the cash funds into the general fund. Nevertheless, we perceive no reason for distinguishing between allegations of unlawful expenditures of state funds and the unlawful transfers of such funds. *Compare Bobo v. Kulongoski,* 338 Or. 111, 107 P.3d 18

(2005)(taxpayers' standing to bring an action against the state challenging a bill that retroactively transferred federal Medicaid funds out of the state's general fund was unchallenged); *with Rukavina v. Pawlenty,* 684 N.W.2d 525, 531 (Minn.Ct.App.2004) (taxpayers lacked standing to challenge transfer of funds from special mineral fund to the general fund to reduce budget deficit because they did not allege the action was unlawful; court concluded "the individual challenges in this case [were] based primarily on [taxpayers'] disagreement with policy or the exercise of discretion by those responsible for executing the law").

We also distinguish the Taxpayers' constitutional challenges in this case from circumstances in which taxpayers challenge a statute and there is no indication the legislature intended to confer upon them such an interest. *See Olson v. City of Golden, supra.*

The Supreme Court's recent decision in *Lance v. Coffman,* —— U.S. ——, 127 S.Ct. 1194, 167 L.Ed.2d 29 (2007), does not require a different result. That case arose after the Colorado Supreme Court announced *People ex rel. Salazar v. Davidson,* 79 P.3d 1221 (Colo.2003), which invalidated a redistricting plan passed by the state legislature and ordered the use of a redistricting plan created by the state courts.

Three days after *Salazar* was decided, four Colorado citizens, none of whom had participated in *Salazar,* filed a complaint in federal district court alleging that "Article V, § 44 of the Colorado Constitution, as interpreted in *Salazar,* violated [the Elections Clause of the United States Constitution] by depriving the state legislature of its responsibility to draw congressional districts." *Lance v. Davidson,* 379 F.Supp.2d 1117, 1122 (D.Colo.2005). As relevant here, a three-judge panel of the United States District Court for the District of Colorado dismissed the case, concluding that issue preclusion barred the plaintiffs' Elections Clause claim.

The plaintiffs appealed to the Supreme Court, which upheld the dismissal on other grounds, namely that the plaintiffs lacked standing to bring their action in federal court. The Court stated:

Federal courts must determine that they have jurisdiction before proceeding to the merits. Article III of the Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." One component of the case-or-controversy requirement is standing, which requires a plaintiff to demonstrate the now-familiar elements of injury in fact, causation, and redressability. "We have consistently held that a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy."

*Lance v. Coffman, supra,* — U.S. at —, 127 S.Ct. at 1196 (citations omitted) (quoting *Lujan v. Defenders of Wildlife, supra,* 504 U.S. at 573–74, 112 S.Ct. at 2143).

The Court added: "[T]his general right [possessed by every citizen, to require that the Government be administered according to law and that the public moneys be not wasted] does not entitle a private citizen to institute [a suit] in the federal courts." *Lance v. Coffman, supra,* — U.S. at —, 127 S.Ct. at 1197 (quoting *Fairchild v. Hughes,* 258 U.S. 126, 129–30, 42 S.Ct. 274, 275, 66 L.Ed. 499 (1922)).

Thus, the Court in *Lance v. Coffman, supra,* simply restated the requirement that plaintiffs demonstrate standing under Article III before they can bring an action *in federal court.* However, nothing in the Court's decision affects the standing of private citizens and taxpayers to bring lawsuits *in state court* alleging violations of their rights under their state constitution. While federal decisions may be considered for guidance, we are ultimately governed by state principles of standing, rather than the federal principles created by Article III of the United States Constitution and addressed in federal decisions. *See Grossman v. Dean,* 80 P.3d 952, 959 (Colo.App.2003)(Colorado Supreme Court cases "reflect a more expansive view of standing under Colorado law than that expressed under federal law").

Accordingly, we conclude the Taxpayers have standing to challenge the transfers from the special funds into the general fund, and the trial court erred in ruling otherwise.

### D. Heggem–Lundquist's Standing

However, we agree with the trial court that Heggem–Lundquist lacks standing to raise its individual challenges to transfers from the major medical, subsequent injury, and workers' compensation cash funds into the general fund.

Heggem–Lundquist is a paint company that does interior finishes for the construction industry and individual homeowners. It is required by Colorado law to obtain workers' compensation insurance for its employees, and it asserts that it pays approximately $400,000 per year in workers' compensation insurance premiums.

It is undisputed Heggem–Lundquist does not pay the surcharge on workers' compensation insurance premiums that is allocated to the major medical, subsequent injury, and workers' compensation cash funds. That surcharge is assessed to its insurer. We are also unaware of any evidence in the record showing that Heggem–Lundquist's insurer is legally obligated to pass the surcharge on to its customers, or that Heggem–Lundquist is legally required to purchase coverage from an insurer who passes through that cost. We therefore conclude Heggem–Lundquist has not shown an injury in fact, and it lacks standing to bring its individual claims. Accordingly, we affirm that part of the trial court's order.

Because individual standing and taxpayer standing have distinct requirements, our conclusion that Heggem–Lundquist lacks standing to bring its individual claims is not inconsistent with our conclusion that it has standing to file this lawsuit in its capacity as a taxpayer, as do the other Taxpayers. *See Women's Emergency Network v. Bush, supra; Lujan v. Defenders of Wildlife, supra; Brotman, supra.*

### IV. Taxpayers' Constitutional Claims

Given our conclusion that the individual claims of Barber and Kerber are moot and

that Heggem–Lundquist lacks standing to bring its individual claims, the only remaining claims before us are the Taxpayers' claims that the transfers violated TABOR and Colo. Const. art. XI, §§ 3–4. Therefore, we next address the trial court's summary judgment in favor of the state defendants on the Taxpayers' constitutional claims, and its conclusion that the transfers did not violate either article of the Colorado Constitution. We conclude that certain of those claims should not have been dismissed.

### A. Standard of Review

We review a grant of summary judgment de novo. *BRW, Inc. v. Dufficy & Sons, Inc.,* 99 P.3d 66 (Colo.2004). Summary judgment is proper if the pleadings, affidavits, depositions, or admissions show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Civil Serv. Comm'n v. Pinder,* 812 P.2d 645 (Colo.1991). The moving party has the burden of establishing the nonexistence of a genuine issue of material fact. *Pinder, supra.*

We also review the interpretation of a constitutional provision de novo. *Bruce v. City of Colorado Springs,* 129 P.3d 988, 992 (Colo.2006).

### B. Did the Transfers Violate TABOR?

In their complaint, the Taxpayers allege that the transfers of the cash funds at issue violated TABOR, which circumscribes the revenue, spending, and debt powers of state and local governments, *Bruce v. City of Colorado Springs,* 131 P.3d 1187, 1189 (Colo.App. 2005), and requires voter approval in advance of the "creation of any multiple-fiscal year direct or indirect district debt or other financial obligation whatsoever." Colo. Const. art. X, § 20(4)(b); *see City of Golden v. Parker,* 138 P.3d 285, 288 (Colo.2006).

The Taxpayers do not dispute the fact that, with the exception of the unclaimed property trust fund, each of the cash funds initially was a "special fund" that consisted of fees, surcharges, and assessments. However, they maintain that the state defendants unlawfully "raided" these funds and that the transfer of some $442 million into the general fund to pay the general expenses of govern-ment is a "back-door tax increase" because special taxes, fees, surcharges, and assessments will be needed to replenish the money taken by the legislature. In other words, the Taxpayers maintain that the state defendants have transformed fees, surcharges, and assessments into a "new tax" or, alternatively, have effected a "tax policy change" in violation of TABOR. We disagree.

The distinction between a "tax" and a "fee" depends on the nature and function of the charge imposed. *Bruce v. City of Colorado Springs, supra,* 131 P.3d at 1190; *Westrac, Inc. v. Walker Field,* 812 P.2d 714, 716 (Colo.App.1991).

> A fee is a charge imposed on persons or property to defray costs of a particular government service. A tax is a means of distributing the general burden of the cost of government, rather than an assessment of benefits.
>
> . . . .
>
> A special fee is not imposed to defray the general expenses of government, but rather to defray the cost of a particular governmental service. Special fees need not be voluntary.

*Bruce v. City of Colorado Springs, supra,* 131 P.3d at 1190 (citations omitted)(rejecting argument that city's street light service charge and cable television charges were taxes subject to voter approval under TABOR); *see Marcus v. Kansas Dep't of Revenue,* 170 F.3d 1305, 1311–12 (10th Cir.1999) (a tax is imposed by a legislative body to benefit the entire community whereas a fee is imposed by an agency upon those subject to its regulation to defray the agency's regulatory expenses; court concluded an assessment was not a tax where the "essential character" of the charge was regulatory); *see also Zelinger v. City & County of Denver,* 724 P.2d 1356, 1359 (Colo.1986)(service charge is not a tax where charge did not raise revenue for general municipal purposes as a "sole or principal objective").

Although we have found no Colorado case directly addressing the Taxpayers' argument, *Colorado National Life Assurance Co. v. Clayton,* 54 Colo. 256, 130 P. 330 (1913), offers guidance. There, the plaintiffs chal-

lenged a percentage charge on insurance premiums collected in the state, contending it was an illegal revenue raising measure. The Colorado Supreme Court rejected the argument, stating:

A bill designed to accomplish some well-defined purpose other than raising revenue is not a revenue measure. Merely because, as an incident to its main purpose, it may contain provisions, the enforcement of which produces a revenue, does not make it a revenue measure.... If the principal object is another purpose, the incidental production of revenue growing out of the enforcement of the act will not make it a bill for raising revenue.

*Colorado Nat'l Life Assurance Co. v. Clayton, supra*, 54 Colo. at 259, 130 P. at 332. *Compare W. Heights Land Corp. v. City of Fort Collins*, 146 Colo. 464, 469, 362 P.2d 155, 158 (1961) ("If [the ordinance's] principal object is to defray the expense of operating a utility directed against those desiring to use the service, the incidental production of revenue does not make it a revenue measure."); *with Bd. of Comm'rs v. Dunn*, 21 Colo. 185, 188, 40 P. 357, 358 (1895)(license fee becomes a tax "when all the elements of regulation or restraint are wanting, and the primary purpose of the act is the raising of revenue only").

In *Marcus, supra*, the State of Kansas imposed an assessment for disabled parking placards, and money collected in excess of the amount necessary to administer the program was directed into the general fund. The plaintiffs filed an action in federal court challenging the assessment, contending it constituted a tax rather than a regulatory fee for purposes of the federal Tax Injunction Act. Whether the assessment was a tax or a fee was a dispositive issue because the Tax Injunction Act divests federal courts of subject matter jurisdiction over claims challenging state taxation procedures where the state courts provide a plain, speedy, and efficient remedy. *Marcus, supra*, 170 F.3d at 1309 (citing *Lussier v. Florida*, 972 F.Supp. 1412, 1417 (M.D.Fla.1997)).

The court in *Marcus* concluded the assessment was not a tax within the meaning of the Act, even though some of the funds collected

by Kansas "ultimately reach[ed] the general fund of the county," because "the essential character of the ... charge [was] regulatory." *Marcus, supra*, 170 F.3d at 1311–12.

*Bobo v. Kulongoski, supra*, is also instructive. There, taxpayers brought an action for declaratory relief against the state, challenging a bill that retroactively transferred federal Medicaid funds out of the state's general fund. The transfer resulted in a reduction in the amount of money available in the general fund that would have been returned to taxpayers as part of a "kicker" refund. The Oregon Supreme Court upheld the transfer, concluding it was not a "bill for raising revenue" within the meaning of state constitutional provisions and therefore did not require compliance with procedural requirements, including a three-fifths vote of the state house of representatives.

The Oregon Supreme Court reasoned that the bill authorizing the transfer of funds did not raise revenue for two reasons:

First, a bill will "raise" revenue only if it "collects" or "brings in" money to the treasury. Second, not every bill that collects or brings in money to the treasury is a "bil[l]" for raising revenue." Rather, the definition of "revenue" suggests that the framers had a specific type of bill in mind—bills to levy taxes and similar exactions.

*Bobo v. Kulongoski, supra*, 338 Or. at 120, 107 P.3d at 23.

The Oklahoma Supreme Court addressed the issue of when a transfer of funds becomes a tax or revenue raising measure in *Calvey v. Daxon*, 997 P.2d 164, 171 (Okla. 2000). There, Oklahoma legislators challenged the constitutionality of legislative acts that transferred cash from fee-generated funds into a special cash fund. The special cash fund was created by the legislature and was "subject to legislative appropriation or transfer as provided by law and shall consist of such monies as the Legislature may direct to be transferred to said fund." *Calvey v. Daxon, supra*, 997 P.2d at 167 n. 4 (quoting Okla. Stat. tit. 62, § 253). The Oklahoma Supreme Court concluded the transfer of funds did not change the nature of the funds

and therefore did not constitute a revenue raising measure. It reasoned as follows:

> [L]aws imposing a tax or a license fee incidental thereto are not revenue raising laws [under the Oklahoma Constitution]. The [plaintiffs] contend that the fees composing the fee-generated funds, once transferred, may no longer be considered "incidental" to the regulatory scheme for which they were imposed. Nevertheless, they present no clear argument that the fees were not imposed in furtherance of the laws for which they were assessed. Rather, they insist that the transfer resulted in a change in the nature of the fees from being incidental to the legislation for which they were imposed to being general revenue for the state. We are unpersuaded by the argument. *Incidental fees and taxes, not constituting revenue raising measures, do not become subject to the procedural requirements of art. 5, § 33 [which forbids raising taxes without a vote of the people] via the mere transfer from one fund to another.*

*Calvey v. Daxon, supra,* 997 P.2d at 171 (emphasis added; footnotes omitted); *see Valstad v. Cipriano,* 357 Ill.App.3d 905, 917, 293 Ill.Dec. 544, 828 N.E.2d 854, 868 (2005)("[T]he transfer of money accumulated in special funds into a general revenue fund is generally within the legislature's province and authority.").

█ In this case, we likewise conclude the legislative acts authorizing the transfers of the cash funds did not constitute revenue raising bills or create a "new tax" or "tax policy change directly causing a net tax revenue gain," within the meaning of Colo. Const. art. X, § 20(4). Even though these funds began as special funds, we conclude that their transfer into the general fund did not alter their "essential character." *See Marcus, supra,* 170 F.3d at 1311–12; *see also Baines v. New Hampshire Senate President,* 152 N.H. 124, 136, 876 A.2d 768, 780 (2005)("[M]oney bills or bills for raising revenue are confined to bills which levy taxes in the strict sense of the word, and do not apply to bills which incidentally raise revenue or involve appropriation of state money." (quot-

ing *Opinion of Justices,* 102 N.H. 80, 82, 150 A.2d 813, 815 (1959))).

The Taxpayers' reliance on *Bloom v. City of Fort Collins,* 784 P.2d 304 (Colo.1989), is misplaced. There, a class action was brought challenging the validity of a transportation utility fee imposed by the City of Fort Collins. The district court concluded the fee was an invalid tax. But, on review, the Colorado Supreme Court held the transportation utility fee imposed on owners or occupants of developed lots or parcels of land within the city was for the purpose of providing revenues for the maintenance of local streets, and was *not* a property tax subject to the constitutional uniformity requirement. Instead, the court concluded it was a special fee imposed on owners or occupants of developed lots fronting city streets that was reasonably related to expenses incurred by the city in carrying out its legitimate goal of maintaining city streets.

However, the supreme court struck down a section of the ordinance authorizing the city council to transfer any excess revenues not required to satisfy the purpose of the ordinance to any other fund of the city. The court explained why this pour-over provision in the ordinance was defective:

> The transfer of a substantial amount of money generated by the transportation utility fee to some other city fund would be tantamount to requiring the class of persons responsible for the fee—the owners or occupants of developed lots fronting city streets to—bear a disproportionate share of the burden of providing revenues to defray general governmental expenses unrelated to the purpose for which the fee is imposed. The effect of such a transfer would be to render the transportation utility fee the functional equivalent of a tax.

*Bloom, supra,* 784 P.2d at 311.

We conclude *Bloom* is distinguishable for several reasons. First, the decision preceded the enactment of TABOR. Thus, the supreme court did not address it or rely on any other constitutional provision in reaching its result. Further, when the supreme court has addressed TABOR, it has avoided interpretations of the amendment that would hinder basic governmental operations, seeking

instead to advance the purpose of TABOR, which is to limit the growth of government, and not to hinder the delivery of basic services and functions. *See In re Submission of Interrogatories on House Bill 99–1325*, 979 P.2d 549, 557 (Colo.1999)(rejecting a literal interpretation of a TABOR term because it "could lead to absurd results" and "cripple the everyday workings of government"); *Bolt v. Arapahoe County Sch. Dist. No. 6*, 898 P.2d 525, 537 (Colo.1995)(rejecting a rigid interpretation of TABOR "which would have the effect of working a reduction in government services").

Here, the legislative acts authorizing the cash transfers did not increase the growth of government, create new income streams, or constitute "a tax policy change directly causing a net tax revenue gain to any district." Colo. Const. art. X, § 20(4); *see Bobo v. Kulongoski, supra.* Unlike the transportation utility fee at issue in *Bloom*, which was structured to permit an ongoing transfer or diversion of funds, the transfers here were also onetime occurrences under extraordinary circumstances taken to address immediate revenue shortfalls. There is no indication the General Assembly intends to use special funds on a regular basis to supplement the general fund. For these reasons, *Bloom* does not compel the result the Taxpayers seek.

We are simply not persuaded by the Taxpayers' argument that the transfers of the cash funds into the general funds changed them from special funds into tax funds and therefore created a "new tax" or "tax policy change directly causing a net tax revenue gain" in violation of Colo. Const. art. X, § 20(4). We therefore conclude the acts authorizing the transfers from the cash funds into the general fund did not violate TABOR.

### C. Did the Transfers Violate Art. XI?

The Taxpayers also contend (1) the statutes authorizing the transfers created an obligation to repay the money transferred back to the special funds; (2) the transfers thus created "debt" in violation of Colo. Const. art. XI, § 3; and (3) the statutes authorizing the transfers did not create any new revenues to repay the obligation in violation of

Colo. Const. art. XI, § 4, which prohibits the pledging of state revenue for future years without levying a tax sufficient to repay such debt. We disagree.

### 1. Is the Legislature Required to Repay the Money?

At the heart of the Taxpayers' argument is their premise that the General Assembly is under an obligation to return the money it transferred from the cash funds. That premise is based on another premise, which is that some or all of the cash funds are trusts and that the state defendants, as trustees, have a fiduciary obligation to repay the money. We conclude that, with the possible exception of three funds, none of the twenty-nine cash funds at issue here is a trust.

Under our tripartite system of government, the General Assembly has plenary power over the appropriations of "state monies," subject only to constitutional limitations. *In re Interrogatories Submitted by Gen. Assembly*, 88 P.3d 1196, 1200 (Colo. 2004); *Colo. Gen. Assembly v. Lamm*, 704 P.2d 1371, 1380 (Colo.1985)(concluding the General Assembly's imposition of restrictions on revenue sources for its appropriations did not violate separation of powers); *see also* Colo. Const. art. V, § 32 (directing the General Assembly to issue an appropriations bill to cover the expenses of the executive, legislative, and judicial departments); Colo. Const. art. V, § 33 ("No moneys in the state treasury shall be disbursed therefrom by the treasurer except upon appropriations made by law, or otherwise authorized by law...."); *Lamm, supra*, 700 P.2d at 510; *Anderson v. Lamm*, 195 Colo. 437, 442, 579 P.2d 620, 623 (1978). "Plenary" is defined as "complete in every respect: Absolute, Perfect, Unqualified." *Webster's Third New International Dictionary* 1739 (1986).

An "appropriation" has been defined as "authority of the [l]egislature given at the proper time and in legal form to proper officers to apply a specified sum from a designated fund out of the treasury for a specified object or demand against the state." *Blaine County Investment Co. v. Gallet*, 35 Idaho 102, 106, 204 P. 1066, 1067 (1922). If

an appropriation is purely discretionary and nonobligatory, it is not a payment on a constitutional debt. *See In re Interrogatory Propounded by Governor Romer*, 814 P.2d 875, 889 (Colo.1991).

Pursuant to § 24–75–201(1), C.R.S.2006, the General Assembly designates funds into two basic categories. The general fund includes all revenues and monies not otherwise required by the state constitution or other law to be paid into another fund. Section 24–75–201(1). A "cash fund" is any fund, other than the general fund, established by law for a specific purpose or program. Section 24–75–402(2)(b), C.R.S.2006. A "[s]tate cash fund appropriation" means "any appropriation of moneys which are not general fund moneys and which are the result of the collection of any fee authorized bylaw." Section 24–75–201.1(1)(a)(VII)(D), C.R.S.2006.

A special fund designation means that money from the general fund is not used to fund the activity for which the special fund was created. However, it does not prohibit the General Assembly from appropriating the money in the special fund for another purpose. *Lamm, supra*, 700 P.2d at 510 (recognizing legislature's plenary power over appropriations).

The Taxpayers acknowledge the General Assembly's broad authority over state funds, but nevertheless contend that certain of the funds here are "public trusts," and that the state defendants violated their fiduciary duty to the Taxpayers by transferring them into the general fund. We therefore address the nature of public trusts.

### 2. Public Trusts

■■ A special fund does not become a "trust" merely because the legislature designates a purpose for which it may be expended. The existence and extent of a trust created by statute must be determined by the language of the statute. *United States v. Mitchell*, 445 U.S. 535, 542, 100 S.Ct. 1349, 1353, 63 L.Ed.2d 607 (1980). The language must be specific, and the intent to impose a trust or other fiduciary duty must be manifest. *Branson Sch. Dist. RE–82 v. Romer*, 161 F.3d 619, 633–34 (10th Cir.1998) (the statute must enumerate the government's

duties sufficiently to justify a conclusion that the legislature intended a trust or fiduciary relationship); *Dist. 22 United Mine Workers v. Utah*, 229 F.3d 982, 989 (10th Cir.2000); *Brotman, supra*, 31 P.3d at 893 ("[a] trust is created when a settlor conveys property to a trustee with a manifest intent to impose a fiduciary duty on that person requiring that the property be used for a specific benefit of others" (quoting *Branson, supra*, 161 F.3d at 633)); *see Dadisman v. Moore*, 181 W.Va. 779, 785, 384 S.E.2d 816, 822 (1988) (concluding that by the use of the term "Trustee" in the statute creating the public employees' retirement system, the legislature imposed upon the trustees the highest fiduciary duty to maintain the terms of the trust).

Here, it is undisputed that only three of the statutes creating the funds expressly use the word "trust" to describe them and state that a trust fund is created. These are the Colorado children's trust, § 19–3.5–106, C.R.S.2006; the severance tax trust fund, § 39–29–109, C.R.S.2006; and the unclaimed property trust fund, § 38–13–116.5, C.R.S. 2006. *See In re Kroh Bros. Dev. Co.*, 284 B.R. 264, 271 n. 17 (Bankr.W.D.Mo.2002)("[U]nder Colorado law, unclaimed funds do not escheat to the State, but are held in perpetuity by the State."). None of the other funds the Taxpayers urge us to designate as "public trusts" uses the word "trust" in the enabling legislation, and thirteen of the funds contain no references to a trust or any language suggesting an intent by the legislature to create one.

■ In support of their argument that certain of the cash funds constitute public trusts, the Taxpayers rely on language in the enabling statutes providing that "[a]ny unexpended and unencumbered moneys remaining in the cash fund at the end of any fiscal year shall remain in the cash fund and shall not be credited or transferred to the general fund or any other fund." Section 24–33.5–1707(1)(a), C.R.S.2006 (Identity Theft and Financial Fraud Cash Fund); *see* §§ 22–7–506(4)(a)(I) (Read–to–Achieve Grant Program), 24–22–117(1)(a) (Tobacco Tax Cash Fund), 25–21.5–105(1) (Colorado Dental Program Act), C.R.S.2006 (all similar wording).

However, we conclude this language is insufficient to show a definitive legislative intent to create a public trust. While it is undoubtedly within the legislature's prerogative to determine whether a fund is to be a public trust or merely a special fund, we cannot overlook the fact that the legislature was explicit in designating three of the twenty-nine funds as trusts. Yet it chose not to include such express language in establishing the other cash funds.

We construe the language on which the Taxpayers rely to mean that any unspent money in these cash funds does not, by default, revert to the general fund at the end of a fiscal year. But we do not read such language as creating a public trust or as limiting the legislature's plenary power to determine where state money is needed and to transfer special funds to meet that need. *Cf. Aspen Wilderness Workshop, Inc. v. Colo. Water Conservation Bd.*, 901 P.2d 1251, 1263 (Colo.1995)(Mullarkey, J., dissenting)("[T]he concept of a public trust has no independent content.... Where the legislature has provided statutory directives for the management and protection of public resources, 'those statutory duties "comprise *all* the responsibilities which defendants must faithfully discharge." ' " (quoting *Sierra Club v. Block*, 622 F.Supp. 842, 866 (D.Colo.1985), and *Sierra Club v. Andrus*, 487 F.Supp. 443, 449 (D.D.C.1980))).

In reaching our conclusion, we note that some states, such as Oklahoma, have enacted public trust acts, which make it clear when a public trust has been created. For example, Okla. Stat. tit. 60, § 176.1(A) provides:

[With exceptions not relevant here] a public trust duly created in accordance with [the statute] shall be presumed for all purposes of Oklahoma law to:

(1) Exist for the public benefit;

(2) Exist as a legal entity separate and distinct from the settlor and from the governmental entity that is its beneficiary; and

(3) Act on behalf and in the furtherance of a public function or functions for which it is created even though facilities financed by the public trust or in which the public trust has an ownership interest may be operated by private persons or entities pursuant to contract.

*See House of Realty, Inc. v. City of Midwest City,* 109 P.3d 314, 319 (Okla.2004)("The parties do not dispute that the Hospital Authority is a trust created under the provisions of sections 176 through 180.55 of Title 60, commonly referred to as Oklahoma's 'public trust act.' "); *see also Day v. Apoliona,* 451 F.Supp.2d 1133, 1135 (D.Haw.2006) (under Haw. Const. art. XII, § 4, the public lands granted to the state, as well as the proceeds and income derived from those lands, were to be held by the state "as a public trust" and "the State is the trustee of that public trust and is obligated to use the trust lands and funds for [certain] enumerated purposes").

We have not been cited to any such statute in Colorado, and given the vague language in the statutes creating the cash funds at issue here, we conclude that, with the possible exception of the three funds expressly described as "trusts," the cash funds are special funds created by statute and are not public trusts. *See Travelers' Ins. Co. v. City of Denver,* 11 Colo. 434, 439–40, 18 P. 556, 559 (1888). Accordingly, we further conclude the state defendants are not trustees of such funds, they do not have a fiduciary duty to preserve the funds, and neither they nor the legislature has an obligation to repay the funds.

As to the Colorado children's trust, the severance tax trust fund, and the unclaimed property trust fund, the state defendants argue that even if these funds are trusts, they are merely statutory trusts subject to the terms of the applicable statutes, and that as settlor of the trusts, the General Assembly has the power to revoke or modify them.

The statutes creating these funds describe their intended purposes. However, on the limited record before us, we are unable to determine as a matter of law the manner in which disbursements may be made from those funds, and the trial court did not address these specific issues. We therefore conclude summary judgment should not have been granted as to these three funds, and we remand the case for further proceedings on the issues affecting them.

### 3. Transfers of Special Funds

We further conclude the legislature has the authority to transfer the special funds into the general fund.

In reaching this conclusion, we observe that a number of state courts have upheld the power of their legislatures to transfer money from special funds created from specified sources, as long as the transfers did not conflict with a constitutional provision controlling such funds, invade a trust, or impair a contractual relationship. *See Mitchell v. State Child Abuse & Neglect Prevention Bd.,* 512 So.2d 778 (Ala.Civ.App.1987)(money not necessary for immediate use in state trust fund financed by state income tax refund designation program could be transferred to different program); *Dep't of Pub. Welfare v. Haas,* 15 Ill.2d 204, 214, 215, 154 N.E.2d 265, 272 (1958) ("The fact that the legislature may provide that amounts, when collected, shall be placed in a certain fund does not ordinarily preclude a later General Assembly from ordering it paid into another fund or from abolishing the fund altogether."); *Des Moines Metro. Area Solid Waste Agency v. Branstad,* 504 N.W.2d 888, 890 (Iowa 1993) (holding that legislature had authority to transfer groundwater protection funds into the general fund as long as it did not conflict with constitutional provision controlling such fund and did not violate a constitutional provision, a trust, or a contractual relationship); *Mich. Sheriffs' Ass'n v. Mich. Dep't of Treasury,* 75 Mich.App. 516, 255 N.W.2d 666, 672 (1977)("[I]n the absence of a constitutional prohibition or a trust or contractual relationship ... the law does allow a transfer by the Legislature from a fund established for a designated purpose into a fund whose purpose is different, providing that the fund into which the transfer is made is subject as here, to legislative control."); *Calvey v. Daxon, supra* (upholding legislative acts transferring cash from fee-generated funds into "special cash fund"); *Apa v. Butler,* 638 N.W.2d 57, 66 (S.D.2001) (legislature may transfer appropriations from special funds unless prohibited by the state constitution); *Dadisman v. Moore, supra,* 181 W.Va. at 788, 384 S.E.2d at 825 (concluding actions of legislature to "transfer and expire" public employ-ees' pension trust fund appropriations before the end of relevant fiscal years were invalid, unlawful, and void).

*State v. Board of Levee Commissioners,* 932 So.2d 12 (Miss.2006), offers us additional guidance. There, as here, the state legislature enacted a bill providing for the transfer of funds. The Mississippi statute provided:

> During the period beginning upon July 1, 2004, and through June 30, 2005, the Board of Levee Commissioners of the Yazoo—Mississippi Delta Levee District, upon demand of the State Fiscal Officer, shall transfer to the State Treasurer a sum or sums not exceeding a total of Five Million Dollars ($5,000,000), which shall be deposited into the Budget Contingency Fund.

*State v. Bd. of Levee Comm'rs, supra,* 932 So.2d at 14 (quoting House Bill 1279 § 7(4) (2004)).

The Board of Levee Commissioners filed a declaratory judgment action asserting that the legislation was unconstitutional because, as relevant here, the transfer of board funds encroached upon the constitutionally vested powers of the board. Before resolving the issue, the Mississippi Supreme Court discussed the broad authority of state legislatures: "[A] state constitution does not grant specific legislative powers, but limits them, and ... the lawmaking department possesses all legislative powers not prohibited or restricted by the state or federal constitution, and certainly the power extends to circumstances not covered by the constitutions at all." *State v. Bd. of Levee Comm'rs, supra,* 932 So.2d at 21 (quoting *Farrar v. State,* 191 Miss. 1, 2 So.2d 146, 148 (1941)).

The Mississippi Supreme Court added:

> [T]he control of the purse strings of government is a legislative function. Indeed, it is the supreme legislative prerogative, indispensable to the independence and integrity of the Legislature, and not to be surrendered or abridged, save by the Constitution itself, without disturbing the balance of the system and endangering the liberties of the people. The right of the Legislature to control the public treasury, to determine the sources from which the public revenues shall be derived and the

objects upon which they shall be expended, to dictate the time, the manner, and the means both of their collection and disbursement, is firmly … established in our political system.

State v. Bd. of Levee Comm'rs, supra, 932 So.2d at 22 (emphasis omitted) (quoting Colbert v. State, 86 Miss. 769, 39 So. 65, 66 (1905)).

Nevertheless, the court held that because the board was a "constitutionally-created entity," rather than a "statutorily-created entity," the legislature's attempt to transfer board funds was unconstitutional: "The Legislature has the right to prescribe, alter, or change at its discretion the procedure and method of operation of the board, so long as it does not infringe upon the proper and efficient exercise of the power granted the levee commissioners by the Constitution." State v. Bd. of Levee Comm'rs, supra, 932 So.2d at 22.

Unlike in Board of Levee Commissioners, none of the twenty-nine cash funds at issue here was constitutionally created. Each was statutorily created by the legislature and then funded by assessments, fees, and surcharges authorized by the legislature. Thus, the restrictions placed on the Mississippi legislature by virtue of the Levee Board's constitutionally created status do not exist in this case. We recognize that in Colorado, TABOR and Colo. Const. art. XI, §§ 3–4 place limitations on the legislature's ability to tax and spend, as does the Due Process Clause and other provisions in the Colorado Constitution. See Colo. Const. art. II, § 25 (providing that "[n]o person shall be deprived of life, liberty or property, without due process of law"). But these limitations do not alter the fact that, unlike in Board of Levee Commissioners, where the board's authority to administer the funds was constitutionally created, the special funds and the general fund here are all under the aegis of the Colorado legislature. Cf. Marcus v. Kansas Dep't of Revenue, supra (holding that fees, surcharges, and assessments that are assessed by the state for a particular purpose may be used on certain occasions for a different purpose without altering their status or converting them into taxes).

We have concluded that the twenty-nine cash funds, with the three possible exceptions, do not constitute public trusts and that the money taken from such funds does not have to be repaid by the legislature. Because these cash funds were all created by the legislature, we further conclude they are subject to its inherent power to alter or amend them as well as its power under § 2–4–216, C.R.S.2006, to reduce funding, eliminate the funds, or transfer them into the general fund. Therefore, the trial court correctly determined that the transfers of these funds into the general fund did not violate Colo. Const. art. XI, §§ 3–4.

#### 4. Debt

■ We further conclude the transfers of the cash funds did not create "debt" within the meaning of Colo. Const. art. XI, §§ 34.

Colo. Const. art. XI, § 3 provides that the "state shall not contract any debt by loan in any form," with certain exceptions. Colo. Const. art. XI, § 4 provides that any debt described in the article must be established by a statute that provides for the levy of a tax sufficient to pay the principal and interest on the debt.

■ A "debt" is created when the state creates an express obligation that pledges future revenue from a tax otherwise available for general purposes to meet the cost of the obligation. See Glennon Heights, Inc. v. Cent. Bank & Trust, 658 P.2d 872, 878–79 (Colo.1983); Johnson v. McDonald, 97 Colo. 324, 340–41, 49 P.2d 1017, 1025 (1935). Thus, a debt is an obligation that (1) pledges revenue in future years; (2) requires the use of revenue from a tax otherwise available for a specific purpose; (3) is legally enforceable against the state in future years; or (4) future legislatures do not have the discretion over which to appropriate funds. In re Submission of Interrogatories on House Bill 99–1325, supra, 979 P.2d at 555; Glennon Heights, supra, 658 P.2d at 878–79; Gude v. City of Lakewood, 636 P.2d 691, 697 (Colo.1981).

Here, none of the statutes authorizing the transfers pledged future revenues or revenues from taxes that are otherwise available

for general purposes. Accordingly, we conclude no "debt" was created within the meaning of Colo. Const. art. XI, §§ 3–4 as a result of these transfers. *See Alabama Alcoholic Beverage Control Bd. v. City of Pelham*, 855 So.2d 1070, 1080–81 (Ala.2003)(concluding the legislature's transfers from the Alcoholic Beverage Control Board's operating funds to the general fund did not create a "new debt" in violation of the state constitution because the funds were not constitutionally required to be repaid).

### D. Authority of Court

In its order denying the Taxpayers' request for relief, the trial court also expressed its view that, even if the cash transfers were improper, it lacked the authority to grant the injunctive relief sought. However, on appeal, no one has questioned the authority of the courts to determine the constitutionality of actions taken by the legislative and executive branches of state government, nor do we. *Bruce v. City of Colorado Springs, supra*, 129 P.3d at 992 (plaintiff contended a city election violated TABOR and sought damages, a declaratory judgment, and injunctive relief); *Evans v. Romer*, 854 P.2d 1270, 1275 (Colo.1993) (upholding preliminary injunction that prevented the state defendants from enforcing state constitutional amendment); *Rocky Mountain Animal Defense v. Colo. Div. of Wildlife, supra* (wildlife welfare group sought declaratory judgment, injunction, and mandamus relief relating to constitutional amendment prohibiting inhumane and indiscriminate methods of killing wildlife); *see Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 180, 2 L.Ed. 60 (1803) ("a law repugnant to the constitution is void"); *Baines v. New Hampshire Senate President, supra*, 152 N.H. at 129, 876 A.2d at 775 (rejecting argument that whether a "money bill" violated state constitution was a nonjusticiable issue: "Reviewing whether the disputed legislation violates [the state constitution] does not demonstrate lack of respect due the legislative branch of government. Rather, it fulfills the constitutional responsibility of the judicial branch.").

### V. Conclusion

That part of the trial court's order concluding Heggem–Lundquist lacked standing to bring its individual claims and dismissing such claims is affirmed. The court's judgment denying Barber's and Kerber's individual claims is also affirmed, because those claims are now moot.

That portion of the court's order concluding the Taxpayers lacked standing to bring their constitutional claims is reversed. The summary judgment in favor of the state defendants is reversed as to the Taxpayers' constitutional claims pertaining specifically to the Colorado children's trust, the severance tax trust fund, and the unclaimed property trust fund, and the case is remanded to the trial court with directions to reinstate the Taxpayers' constitutional claims as to those three funds only and for further proceedings pertaining to them. The judgment and order are affirmed in all other respects.

Judge ROY concurs.

Judge HAWTHORNE concurs in part and dissents in part.

Judge HAWTHORNE concurring in part and dissenting in part.

I concur with parts II and III(D) of the majority opinion. I respectfully dissent from part III(C), in which the majority concludes that the Taxpayers have standing to challenge transfers from the special funds into the general fund. I do not agree with the majority's conclusion that the Taxpayers have standing in this case because I conclude they have not alleged an injury in fact and because they lack standing to assert the claims of third parties. Given these conclusions, I would not reach the merits and therefore express no opinion about part IV of the majority opinion.

### I. Injury in Fact

The requirement that a plaintiff demonstrate an injury in fact derives from the constitutional separation of powers between the executive, legislative, and judicial branches of government, and prevents the judiciary from usurping the powers of other branches.

*See Conrad v. City & County of Denver,* 656 P.2d 662, 668 (Colo.1982); *Wimberly v. Ettenberg,* 194 Colo. 163, 167, 570 P.2d 535, 538 (1977); *see also* Colo. Const. art. III.

Another division of this court has noted that suits in which a plaintiff alleges no personal "injury or cognizable legal interest," but instead claims standing based solely on his or her taxpayer status are "problematic." *Olson v. City of Golden,* 53 P.3d 747, 750 (Colo.App.2002). "Suits such as these highlight the tension between the judiciary's limited powers and its role as a check on the coordinate branches of government. They tempt the courts to overlook prudential limitations on standing, rooted in the separation of powers, in order to redress otherwise non-justiciable wrongs." *Olson, supra,* 53 P.3d at 750 (quoting *Dodge v. Dep't of Soc. Servs.,* 198 Colo. 379, 384, 600 P.2d 70, 73 (1979) (Dubofsky, J., specially concurring)). This is one of those suits.

A proper determination of standing begins with a careful reading of the complaint. Here, the Taxpayers allege only that they pay taxes, and that the legislature has unconstitutionally transferred money from special funds to the general fund. In fact, with the exception of the claims discussed in parts II and III(D) of the majority's opinion, the Taxpayers do not allege that the transfers caused them a tangible or intangible harm, or otherwise invaded their legal rights.

In a similar case, the United States Supreme Court recently determined that plaintiffs who alleged no individual harm lacked standing to challenge the Colorado Supreme Court's interpretation of article V, § 44 of the Colorado Constitution, even though they alleged the interpretation violated the Elections Clause of the United States Constitution, art. I, § 4, cl. 1. The Court noted:

> [T]he problem with this allegation should be obvious: The only injury plaintiffs allege is that the law—specifically the Elections Clause—has not been followed. This injury is precisely the kind of undifferentiated, generalized grievance about the conduct of government that we have refused to countenance in the past.... Because plaintiffs assert no particularized stake in

the litigation, we hold that they lack standing to bring their Elections Clause claim. *Lance v. Coffman,* —— U.S. ——, ——, 127 S.Ct. 1194, 1198, 167 L.Ed.2d 29 (2007) (per curiam). I find no compelling distinction between the generalized nature of the allegations made by the Taxpayers in this case and those made by the plaintiffs in *Lance.*

Thus, even accepting the Taxpayers' allegations as true, they do not satisfy the injury in fact requirement. *See Ainscough v. Owens,* 90 P.3d 851, 856 (Colo.2004) (plaintiff has standing so long as he or she "argues that a governmental action that harms him [or her] is unconstitutional" (emphasis added)); *see also Lance, supra; Brotman v. E. Lake Creek Ranch, L.L.P.,* 31 P.3d 886, 891–92 (Colo.2001) (plaintiff lacked standing because it did not allege the defendant "unlawfully spent any taxpayer funds," or that defendant's management decisions had any effect on it "as a taxpayer").

I disagree with the majority's approach because it conflates the injury in fact and legally protected interest requirements. The majority concludes the Taxpayers have standing because they "have an interest in having general tax dollars spent in compliance with Colo. Const. art. XI, §§ 3 and 4." However, this interest satisfies only the second portion of the standing inquiry, that plaintiffs demonstrate a "legally protected interest," *Wimberly, supra,* 194 Colo. at 168, 570 P.2d at 539, and is insufficient, by itself, to confer standing upon the Taxpayers. *See Ainscough, supra.*

I also disagree with the majority's conclusion because here the Taxpayers do not challenge an expenditure of general tax dollars, but only a transfer from special funds to the general fund; therefore, even under the majority's analysis, they should not have standing. *Cf. Conrad, supra* (recognizing taxpayer standing to challenge unlawful expenditures); *Dodge, supra* (same); *Brotman, supra,* 31 P.3d at 891 (noting that the question decided in *Dodge* was narrow, namely, the circumstances allowing taxpayers "to challenge an allegedly unlawful expenditure of public funds").

While I agree that Heggem–Lundquist lacks standing in this case, I respectfully

suggest that the majority's conclusion regarding Heggem–Lundquist exposes the flaws in its analysis. Heggem–Lundquist asserts standing not only based upon individual economic harm, which as the majority correctly notes is too indirect and speculative to confer standing, but also as a taxpayer challenging transfers from the major medical fund, subsequent injury fund, workers' compensation cash fund, and other funds as unconstitutional. The majority concludes that Heggem–Lundquist lacks individual standing. This conclusion is at odds with the majority's conclusion that the Taxpayers have standing to challenge an unconstitutional transfer of funds. Heggem–Lundquist alleges it is a taxpayer and, under the majority's approach, should have standing to challenge as unconstitutional transfers from the major medical fund, the subsequent injury fund, and the workers' compensation cash fund. The majority's conclusion that Heggem–Lundquist lacks individual standing cannot be reconciled with its conclusion that the Taxpayers have standing in this case.

## II. Third–Party Standing

The Taxpayers also lack standing because they raise the claims of third parties without standing to do so.

A party raising a constitutional challenge generally may not assert "the claims of third parties who are not involved in the lawsuit." *City of Greenwood Village v. Petitioners for Proposed City of Centennial,* 3 P.3d 427, 439 (Colo.2000) (a party "must demonstrate not only that the alleged unconstitutional feature of the statute injures him [or her] but also that he [or she] is within the class of persons with respect to whom the act is unconstitutional" (quoting *Miller v. Albright,* 523 U.S. 420, 446, 118 S.Ct. 1428, 1443, 140 L.Ed.2d 575 (1998)(O'Connor, J., concurring))). Three exceptions to this rule exist where (1) the party before the court has a "substantial relationship" with the third party whose rights are asserted; (2) the third party's assertion of its own rights would be difficult or improbable; or (3) the third party's rights would be diluted if standing were denied. *City of Greenwood Village, supra,* 3 P.3d at 439.

The Taxpayers do not allege that they are required to pay into the special funds, or that there is any other connection between them as taxpayers and those funds. Persons required to pay into the special funds, not the Taxpayers, are the aggrieved parties that would have standing to contest the government's allegedly unlawful transfers from those funds. *See Hughey v. Jefferson County Bd. of Comm'rs,* 921 P.2d 76 (Colo.App. 1996). Though asserting the rights of these third parties, the Taxpayers do not allege that they have a substantial relationship with the third parties, that the third parties would have a difficult time asserting their own rights, or that their rights would be diluted if the Taxpayers were denied standing. Accordingly, in my view the Taxpayers lack standing to challenge transfers from the special funds. *See City of Greenwood Village, supra.*

Because the Taxpayers do not allege an injury in fact, their claims are improper for judicial review. *See Conrad, supra; Wimberly, supra; Olson, supra.* Instead, the Taxpayers' remedy is with the legislative branch of government, which is better suited to deal with "abstract questions of wide public significance." *See Warth v. Seldin,* 422 U.S. 490, 500, 95 S.Ct. 2197, 2205–06, 45 L.Ed.2d 343 (1975) ("Without such limitations ... the courts would be called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights.")(citing *Schlesinger v. Reservists Comm. to Stop War,* 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974)).

Because the Taxpayers' allegations, even if accepted as true, are insufficient to demonstrate they suffered an injury in fact or to permit them to raise the claims of third parties, I disagree with the majority's conclusion that the Taxpayers have standing in this case. Therefore, I respectfully dissent.